STITLE *v.* STITLE.

[No. 30,285. Filed March 24, 1964.]

*Stevenson, Kendall & Stevenson,* of Danville, and *Harry M. Stitle, Jr., pro se,* for appellant.

*Raber & Vandivier, John Carl Vandivier, Jr.,* of Danville, *Raikos, Barton, Rochford & Thomas* and *John J. Rochford,* of Indianapolis, for appellee.

JACKSON, J.—This is an appeal from a judgment of the Hendricks Circuit Court finding appellant guilty of contempt for violation of a support order incident to a decree of divorce previously entered.

The factual situation may be best summarized by reference to the Affidavit for Contempt Citation filed by appellee and appellant's Answer in Denial thereto. The above mentioned pleadings, omitting formal parts, verification and signatures follow chronologically.

"Affidavit for Contempt Citation

"Comes now Pauline A. Stitle, who being first duly sworn upon her oath, says that she is the plaintiff in the above entitled cause of action wherein she was granted a Decree for Divorce on or about December 3, 1956, and as a part of the decree for the divorce entered herein she was awarded the custody of the two minor children of the parties, Harry M. Stitle, III and Stephen A. Stitle.

"That the defendant was ordered to pay the sum of $200.00 per month, payable $100.00 on the first day of each month and $100.00 on the 15th day of each month, for the support and maintenance of said minor children, and that said order for support has since said date not been modified.

"That the defendant has refused, failed and neglected to comply with the order of this Court in that he failed to make all the required payments in the years 1959, 1960 and 1961 and has failed to make payments in the correct amounts in each of said years, and is now in arrears in the approximate amount of $1,100.00.

"That the defendant should be ordered to pay a reasonable sum for the use and benefit of plaintiff's attorneys herein.

"WHEREFORE your Affiant prays that a rule may issue against the defendant to show cause why he should not be punished for his contempt of court in disobeying said order."

"ANSWER DENYING FACTS ALLEGED IN AFFIDAVIT FOR CONTEMPT CITATION.

"Comes now Harry M. Stitle, Jr., defendant herein, and denys the facts stated in the affidavit for contempt citation filed herein on January 11, 1962 and alleges:

"1. That upon the decree of divorce being granted in this court on December 3, 1956, he made a

payment to the Clerk of Marion County, for the use and benefit of plaintiff in the amount of One Hundred Dollars ($100.00) to pay for the second half of December, 1956, for the support of his two sons.

"2. That during the year of 1957, his sons resided with their mother the entire year and he paid the sum of Twenty Four Hundred Dollars ($2,400.00) to the Clerk of Marion Circuit Court for the use and benefit of plaintiff.

"3. That during the year of 1958, his sons resided with their mother the entire year and he paid the sum of Twenty Four Hundred Dollars ($2,400.00) to the Clerk of Marion Dircuit (sic) Court for the use and benefit of plaintiff.

"4. That during the year of 1959, his sons resided with him during the four (4) week period from the 15th day of July until the 14th day of August, during which period no support was payable and he therefore paid the Clerk of Marion Circuit Court for the year 1959, the sum of Twenty Two Hundred Dollars ($2,200.00), for the use and benefit of plaintiff.

"5. That during the year of 1960, his sons resided with him during the month of July, during which period no support was payable and he therefore paid the Clerk of Marion Circuit Court for the year 1960, the sum of Twenty Two Hundred Dollars ($2,200.00), for the use and benefit of plaintiff.

"6. That during the year of 1961, for the first five and one-half months, he paid the sum of Eleven Hundred Dollars ($1,100.00) to said clerk of Marion Circuit Court for the use and benefit of plaintiff, and that his son, Harry III, having graduated from Broad Ripple High School in the second week of June, 1961 and having obtained employment, pursuant to the law of the State of Indiana, ceased to pay support payments for Harry III, but continued to pay support payments for his son, Stephen, at the rate of One Hundred Dollars ($100.00) per month for the remainder of the year 1961.

"7. That in the month of January, 1962, he paid the sum of One Hundred Dollars ($100.00) to the Clerk of the Marion Circuit Court for the use and benefit of plaintiff.

"8. That on February 1, 1962, paid an additional Fifty Dollars, ($50.00) to the Clerk of the Marion Circuit Court for the use and benefit of the plaintiff.

"9. That during the period between September 1, 1961, and December 31, 1961, in addition to the aforesaid support payments for his son, Stephen, he furnished his son, Harry III, funds in excess of Eleven Hundred Dollars ($1,100.00) for the purpose of attending the University of Illinois, and the purchasing of the necessary books, supplies, clothing, etc.

"WHEREFORE, defendant states that he has in all ways complied with the orders of this court and he requests that the Citation for Contempt be dismissed and the same be dismissed at the cost of the plaintiff herein."

Thereafter, prior to a hearing on the contempt citation, appellee filed a Petition to Modify Divorce Decree in which she asked that the previous support order be doubled and also thereafter and prior to the hearing on the contempt citation appellee's attorneys filed their Petition For Allowance of Partial Attorney's Fees.

We have taken appellant's condensed recital of the evidence from his brief, as the appellee in her brief paragraph six page two, "accepts the appellant's condensed recital of the evidence in narrative form" as follows:

"I am Pauline Adair Stitle and am the same Pauline Stitle who was plaintiff in a divorce action in this court wherein a decree was entered about December 3, 1962. The decree provided for payments for the support of my two minor children in the amount of $100.00 on the first of the month

and $100.00 on the fifteenth. This order was complied with in 1957 and 1958, but in 1959 there was an arrears of $200.00 for the month of July and in 1960 there was an arrears of $200.00 for the month of July. In 1961, starting in June, the arrearage for the rest of the year was $650.00.

"Plaintiff's Exhibit 1 a certified copy from the Marion County Clerk of such support payments was admitted and is attached to page 41 of the transcript.

"Harry III, my son, is presently 18 years old, he is presently unemployed and is a student at the University of Illinois. I am not personally able to pay for and support his attendance at the University. His father made arrangements for him to go and this was not at my request nor at Harry's request.

"Harry attended the University of Illinois the full semester of 1961 and is in attendance there now. His tuition is not paid for the second semester and payment has not been made currently for his board and lodging. I paid for his board and lodging for the months of January and February.

"Harry paid for his books for the second semester with moneys I gave him.

"Plaintiff's Exhibits 2 and 3 are my checks to Harry III for $96.80 and $20.00, both dated January, 1962. I received $100.00 support that month. There was still a support order of $200.00 per month. (Ex. 2, Tr. p. 45; Ex. 3, Tr. p. 46)

"I wrote checks to my son in February of $96.80, $35.00 and $15.00.

"Plaintiff's Exhibit 4 is a $26.00 check dated February 5, 1962; Exhibit 5 is a deposit receipt showing deposit in Harry's account on February 7, 1962 of $35.00. (Ex. 4, Tr. p. 47; Ex. 5, Tr. p. 47).

"Harry's March board and lodging bills are not paid. A $70.00 installment has been paid on his tuition. I have made two or three other cash payments to Harry.

"I have contacted Professor Hodge of the School of Architecture.

"My son's report cards are excellent. Harry feels his grades might come down because of worrying.

"I have talked to my husband (former) several times; he is an attorney.

"At the time of the divorce my sons were twelve and ten and in grade school; Harry III has graduated from High School and is in college; Stephen is a Junior in Arlington High School and continues to reside with me and I provide the quarters where he lives and his board, lunches, school expenses, transportation and clothing. Stephen is an excellent student and participates in basketball, baseball and track.

"The expense of maintaining the boys has increased since the divorce; with Harry in the University my costs have been reduced probably three or four dollars a week for food, and Harry's visitations home for which I paid has offset this. When he returns from school he stays at my home. He was home ten days at Christmas and also at mid-term. I expect that if he returns from school to Indianapolis he will stay in my home which is a two bedroom apartment where I have lived since 1956.

"I am employed at American Fletcher National Bank and Trust Company as a clerk in the legal department; my take home pay is $60.00 per week, plus a profit share which varies from year to year. I am unable to continue the maintenance and support of the one son in college and the other one in high school out of my own funds or with the funds I have been receiving from my husband.

"I have not been able to pay any attorney's fees or costs in connection with this contempt proceeding.

"I have not discussed with my former husband the matter of Harry III's expenses at college. I have discussed with him his ability to meet the order under this decree. He said it was not a matter of money. He made plenty of money. He has also said he could send Harry to college. Harry III went to the University of Illinois at his father's suggestion—no, I think this was my son's choice. He wanted to go to the University of Cincinnati but there were two or three ahead of him on the waiting list, so he went to Illinois because he could

get an Architectural degree. There were no demands made by my son. This was a voluntary thing agreed to by my husband.

"HARRY M. STITLE, JR.—Direct Examination (Tr. p. 55, l. 11):

"I am Harry M. Stitle, Jr., I live at 3750 Watson Road in Indianapolis and I practice law in Indianapolis.

"My home is beautiful and large. It has a living room, dining room, breakfast room, kitchen, den, four bedroom, three bathrooms and a social room in the basement. It has been occupied by my wife, my mother for a year, her mother Thursdays and Fridays; both boys were there on Sundays. I have two children other than the boys; Claire, who is now in England, lived there for awhile. I am not supporting my daughters; they are both married.

"Claire, expecting a baby, asked me for One Hundred Dollars ($100.00) and I sent it to her. Her husband is getting out of the Air Force this summer and wants to go to Michigan or Harvard this fall and it will be a question of either the Stitles or the Heaths to help. I will help my son-in-law through college.

"I will send my sons to college too, on my terms. This question of being delinquent I never heard of until October. I quit paying support for Harry last June when he graduated from High School. I want Harry to make his residence with me because I don't want to hear anything from Pauline about Harry's room and board. I gave Harry Eleven Hundred Dollars ($1100.00) in four months; and visited him twice at the University. Pauline has never discussed with me Harry's education. I want my son to make his residence with me so I won't quarrel with my ex-wife.

"I have never filed a petition to modify the custody order, support order or decree.

"The first time I heard about the arrearage was in October—if Pauline thought she had money coming in July, 1960, you could have heard her a mile on the telephone. Perhaps I heard about it in August 1961.

"I made about Twenty-four Thousand Dollars ($24,000.00) last year which is adequate to provide for the college education of Harry III, depending upon what happens to the rest of my family. Mother's only income is social security—I pay her bills.

"(After being interrupted) I don't have a legal obligation to send my son to college. I stopped making payments so I could accumulate One Thousand Dollars ($1,000.00) and give it to Harry. I didn't make it and got Seven Hundred Fifty Dollars ($750.00) which I gave him. I don't expect him to drop out of school; I expect him to get smart enough to talk to me. I haven't checked to see if his tuition is paid; you told me Friday his board and lodging is in arrears—and I refuse to do anything about it. I do not think I owe the One Hundred Dollars ($100.00) per month according to the Court's order. I do not know if my son is employed—his mother just said he is going to college. I do not know whether he has any income of his own.

"HARRY M. STITLE, III—Direct Examination (Tr. p. 59, l. 10):

"I am Harry M. Stitle III; I live at 4138 Edgemore Court, Indianapolis, I am the son of Harry and Pauline Stitle; I am eighteen and a student at the University of Illinois. I'm studying architecture and have been since September 1961. My grades were four or five A's or B+s. The second semester started February 1962 and I am carrying seventeen hours.

"I decided to go to Illinois after I decided to go into Architecture.

"I applied to the University of Cincinnati; there was a waiting list and they felt my grades were not good enough, so I applied and was admitted to the University of Illinois. I discussed with my father my college career on several occasions and he always wanted me to go to college. He would have preferred I go to the University of Cincinnati—but since it did not work out I am in the University of Illinois. Dad in our conversations,

agreed to send me through college—there was no condition set on it about my residing with him.

"My father assisted me last semester—he deposited money in my account in American Fletcher National Bank monthly. My father made deposits until some time in December when he stopped.

"On Christmas Day, at his house, he told me I could go to school on his terms which were that I go to court with him and have the guardianship transferred to him. I don't want this; I want to remain in the custody of mother. My father and I argue—it usually starts out and ends on this matter of support. I also object to my father's excessive drinking.

"My financial condition today is not good; I have $2.11 in my bank account and $5.00 with me. I owe my fraternity $96.80 for my room and board and $40.00 for my initiation fee. Tuition for this semester is $290.00 and I have paid $77.00 on it.

"Plaintiff's Exhibit 6 (Tr. p. 64) is a letter from my father restating the same terms of his supplying funds.

"I worked last summer to help in going to school. I have almost been assured of a Bates scholarship which will pay $250.00 to $290.00 toward my tuition. I'm willing to help myself.

"My father says he is able to help me but only on his terms.

"HARRY M. STITLE, III—Cross-Examination (Tr. p. 66, l. 4):

"I wanted to go to the University of Cincinnati and my father arranged my admission. Then I chose the University of Illinois and my father supplied the car and funds for me to visit that University to see if I wanted to attend—that was rush week.

"When I entered the University of Illinois my father took me in the station wagon with my clothes, etc. My father opened a bank account in AFNB in my name and put $750.00 in the account. He came over Father's Day and gave me $10.00—to have a date as I was about broke and he put $100.00 in the bank for me the next week.

When I was home for Thanksgiving Jeanette and he gave me spending money.

"In December my father gave me $300.00.

"I estimated on Father's Day school would cost approximately $2100.00. My father said that was low and if I made my grades for initiation he would pay for it.

"I told my father my grades were four-twenty to five and he sent me $100.00 for my initiation and pin. It is not paid for because I used the money for other University expenses. In December father told me that he had talked the matter over with Jeanette and with all the problems he had with his mother and Jeanette's mother and everything else that he couldn't give Mother any more money, but he would give me money and I wouldn't owe anything and I could go to school and could have my own bedroom and bathroom.

"HARRY M. STITLE, III—Re-Direct Examination (Tr. p. 67, l. 28):

"My father did not tell me that he was going to give me money in lieu of the support order, he just made voluntary payments to assist in my education. He has not continued to make regular deposits in my account during the second semester.

"PAULINE A. STITLE—Further Direct Examination (Tr. p. 68, l. 13):

"I do not think the present support order is sufficient to maintain a residence and provide board and lodging in my home. I would say I need $200.00 for Stephen. To pay expenses for Harry out of the support order I would need another $200.00 a month.

"HARRY STITLE—Direct Examination (Tr. p. 70, l. 3):

"I am the defendant in this matter. I know of the three petitions being filed.

"In Pauline's testimony there was reference to an arrearage $200.00 in 1959. I don't think there was a payment in July of that year. The boys were with me and the original agreement was that during the time the boys were with me there was

not to be any payments. Pauline never questioned that until this August letter.

"The same facts are true as to the month of July 1960. By the decree the boys were to be with me a month in the summertime and I understood the agreement to be that no support was payable that month.

"Up to, we will say January 1961, support payments have been made every month and many other thousands spent also. I spent between twelve and thirteen hundred dollars on Harry's teeth; four hundred dollars on Stephen's appendectomy; two hundred or two hundred fifty dollars on Harry's broken nose.

"There have been hundreds and hundreds of dollars charged to me that I have gladly paid. My boys are good bowlers and started bowling at the Athletic Club. In one month their bowling checks were $61.10.

"In bowling we found out Harry was very near sighted. We started on corrective lenses—it was expensive—we started too late but it helped some.

"Stephen has a $100.00 watch—a $100.00 set of irons I bought him last summer.

"When the boys play golf they play on my membership at the Country Club. They wanted to swim at the Athletic Club and they did.

"I bought Stephen a $60.00 suit for Christmas; Harry a tux.

"The boys have spent a lot of time at my house. Harry has always been very proud of that house.

"The charges at the Country Club and Athletic Club have been paid by me and were in addition to the support payments. The boys have received lots of spending money from me and Harry had the use of an automobile.

"About the boys being at my home—Harry got off the school bus and came to my home almost every night—that is the way he 'hated' the place. He always wanted to get home before his mother did.

"Harry spent many week ends with me and hundreds of nights.

"Harry still has the privileges of the Athletic Club and Country Club.

"Harry graduated from High School the 8th or 9th of last June and then obtained employment with Paul Cripe as a draftsman and worked there practically until he went to school. I didn't ask him his earnings—he handled the money.

"There was never any arrangements made about Harry's attendance at the University of Illinois—he just entered school and I was trying to put enough money in the bank to keep him there. I continued this through December 1961—in February I sent him $100.00 for his initiation—I didn't know it wasn't paid until today. I have given Harry $1200, or a little more, since he started to the University of Illinois.

"When Harry was home from school we discussed the problem and he said Pauline was holding $100.00 per month for him on the theory she was maintaining one-half a bedroom and supplying some food. Jeanette and I discussed whether Harry could live with us and she said she would love to have him. We proposed this to Harry and thought he was agreeable. The next day when he talked to me it was all wrong—I suppose he had talked with his mother. I told him I can't divide my money between seven or eight families. I told him if he wanted to maintain his residence in my home the financial arrangements would continue and he could spend all the time he wanted with his mother and brother. That is my position today.

"Any other arrangements are too difficult. My mother is in her eighties—how long she can continue to live by herself I do not know. I pay her rent—if she needs a coat I—buy it. I know sometime we will have to put her in a nursing home. Mother is a Christian Scientist. The Christian Science home costs $5000.00 to be admitted and $300.00 per month. Then we have Jeanette's Mother who is terribly sick and how long she can go by herself I haven't any idea. I have proposed to Jeanette's two brothers we divide that expense three ways.

"I know Claire is coming home and Ed will want to go to college.

"Last year was not the best year for me because I was tied up with the Weidlichs. I have over $100,000 worth of life insurance which costs over $3000 a year. My law office expenses are $10,000 a year. I pay income tax and property tax. I practice law and make a lot of money, but I can't divide it between everybody. It doesn't make sense to me that it takes $200 a month for a boy to go to High School. I know Stephen is being adequately supported.

"I am not wanting Pauline to pay for anything. I borrowed the $750 I put in the bank for Harry. I am not pleading poverty. I just want a square deal. Incidentally, speaking of my problems, we do help support Jeanette's mother now. Also, painted her house last year at a cost of $300.

"As I explained previously, I got a letter from Claire who was expecting her second baby; she asked for $100 and I sent it.

"I got a letter from Pauline August 5, 1961, (defendant's Exhibit B Tr. p. 78) which was the first time the question of support was ever mentioned.

"At the present time, I support my wife, Stephen, my Mother, outside of her Social Security, I contribute one-third to the support of my mother-in-law, whose income is $25.00 a month. I do occasionally send something to one of my other children, my daughters.

"I am willing, I state again, so long as I am able to practice law, to make arrangements to send Harry through the University of Illinois providing that the matter can be adjusted so that he will have a room in my home and I do not have double expense.

"All parties thereupon rested and this was all the evidence given in the cause.

March 20, 1962, the court entered its finding and judgment, which in pertinent part, reads as follows:

"Court having taken matters under advisement and being now advised, finds against plaintiff on her petition to modify support order. Court further finds that at the time of the filing of the petition for contempt citation that the defendant was in arrears in the support payments hereinbefore ordered in the amount of $1,100.00; that neither of the minor children herein are emancipated; that although sums of money were paid directly to the minor child Harry Stitle III from time to time there was no showing that any of these sums were expended for the necessities of said minor child; that defendant is in contempt of this court for his refusal to pay support for his minor children as ordered; that $200.00 is a reasonable fee for plaintiff's attorneys in the prosecution of this contempt citation.

"It is, therefore, adjudged that the defendant, Harry Stitle, Jr., is in contempt of this court. The matter of punishment for said contempt is taken under advisement for a period of ten days to give defendant opportunity to purge himself of his contempt and defendant is ordered to pay to plaintiff's attorneys, John J. Rochford and John C. Vandivier, the sum of $200.00 within ten days as attorney fees in the prosecution of this contempt citation. Costs herein are against defendant."

March 29th appellant filed his motion for a new trial on the following grounds:

"1. The finding of the court is not sustained by sufficient evidence.

"2. The finding of the court is contrary to law."

On April 9, 1962, the court entered its order overruling the motion for a new trial and ordered the defendant (appellant) to purge himself forthwith for his contempt.

Appellant's assignment of error is the single ground that "[t]he court erred in overruling the appellant's motion for a new trial."

Basically the proposition relied on by appellant for reversal of the judgment is:

1. That the son, Harry Stitle, III, was emancipated and, consequently appellant was relieved from making further payments pursuant to the support order embodied in the decree.

Emancipation frees a child from the care, custody and control of its parents, what constitutes emancipation of a minor child is a question of law, but whether there has been an emancipation is a question of fact. The subject is discussed rather fully at 22 I. L. E. §18, p. 366 with numerous cases cited and in the interest of brevity herein, reference is made to that work rather than exhaustively discussed here.

The record before us sustains the finding and judgment of the trial court that Harry Stitle III was not emancipated at the time in question.

We think it would follow as a matter of law that if the son, Harry Stitle III, was not emancipated then appellant was required to make the payments in the manner, amount and at the times required by the support order embodied in the divorce decree, at least until such order was modified or set aside.

The Appellate Court of Indiana in the case of *Biedron v. Biedron* (1958), 128 Ind. App. 299, 148 N. E. 2d 209 said, "[i]n this state after support installments have accrued, the court is without power to reduce, annul or vacate such orders retrospectively, and therefore the court committed error in attempting to do so. *Zirkle* v. *Zirkle* (1930), 202 Ind. 129, 172 N. E. 192; *Corbridge* v. *Corbridge* (1952), 230 Ind. 201, 102 N. E. 2d 764; *Ginn* v. *Ginn* (1941), 108 Ind. App. 553, 31 N. E. 2d 65."

The judgment of the trial court is affirmed.

Arterburn and Myers, JJ., concur. Landis, C. J., and Achor, J., concur in result.

NOTE.—Reported in 197 N. E. 2d 174.