Marsha PAYSON, Appellant
(Petitioner Below),

v.

John PAYSON, Appellee (Respondent Below).

No. 4–382A56.

Court of Appeals of Indiana,
Fourth District.

Dec. 15, 1982.

James F.T. Sargent, Greenwood, for appellant.

Duge Butler, Jr., Butler, Brown, Hahn & Little, P.C., Indianapolis, for appellee.

MILLER, Judge.

Appellant Marsha Payson appeals the trial court's judgment requiring her to contribute to the support of the parties' minor children and determining that appellee John Payson was not in arrears in payment of a court ordered support obligation. The instant action began with John's petition to require Marsha to contribute to the support of the couple's three minor sons whose custody had been transferred to him two years earlier. Marsha then filed a cross-petition, seeking both a contempt citation against John for unpaid support as well as a judgment for support arrearages in the stated amount of $14,400.00. Following a judgment requiring her to pay $30 per week support and denying her any amount for the alleged arrearages, Marsha appeals, raising the following issues:

1) Did the trial court err in modifying an earlier modification order [1] by directing her to pay support when there was no evidence of a substantial and continuing change of circumstances since the last modification order?

2) Did the court err in finding no outstanding child support arrearage?

---

1. By the instant suit, John sought modification of the terms of a 1979 agreed entry which transferred custody of the children to him without making any provision for support payments by Marsha, thereby effectively relieving her of any obligation to support the children.

3) Did the court err in crediting John for payments he made directly to Marsha and to third parties (in contravention of the original court order for payments to be made directly to the clerk of court) which were supported in substantial part by documentary evidence in the form of checks made payable both to her and to third parties?

For the reasons stated below, we affirm the trial court's judgment.

## FACTS

The Paysons were married April 11, 1964. Three sons were born of the marriage before it ended on February 5, 1973 in a judgment for divorce, which awarded Marsha custody of the parties' three children and required John to pay $50 per week child support through the clerk of the court. The parties later agreed to a modification of the support order to provide for payment of $60 per week from January 12, 1979 to December 1, 1979 and $73 per week thereafter. However, after Marsha's working hours were changed, the parties' agreement to shift custody to John (which change occurred in May 1979) was finally formalized by a court order of November 8, 1979.

The present litigation began June 12, 1981, when John filed a petition asking the court to order Marsha to contribute to the children's support. Marsha cross-petitioned asking the court to find John in contempt for failure to pay child support and to enter a judgment for support arrearages in the amount of $14,400.00. John answered, asserting he had fully paid the support, but acknowledging such payments had not always been through the clerk. With the case in this posture, a consolidated trial was held September 3, 1981.

At trial, John testified he had fully paid the support by both payments made directly to Marsha and to third parties (primarily rental payments). He further testified that, after Marsha had difficulty managing her finances to meet the monthly rent payments for the apartment she and the children occupied, he and Marsha agreed he would begin paying the apartment's rent in lieu of a portion of the cash support payments. John brought in a number of cancelled checks which showed payments to Marsha and to Lancaster Estates, the apartment complex wherein Marsha and the boys resided. He acknowledged that the record of payments was incomplete, but indicated his bank was only able to supply him with cancelled checks from the last five years. He also testified he had destroyed some of the cancelled checks as well as receipts signed by Marsha for cash payments when he obtained custody of the children as he felt the records were no longer necessary.

Paul C. Oskins and Billy Meeks, co-workers with John at Chrysler Corporation testified they had witnessed cash payments to Marsha. John C. Payson and Robert Payson, the parties' two older sons also testified to the effect that their mother had received regular support payments from their father.

Marsha agreed John had made both direct payments, including cash payments to her and rental payments to Lancaster Estates, and acknowledged her consent to the alternate arrangement. However, Marsha asserted the payments amounted to only about $500 per year in excess of the rental payments though she admitted she had kept no records of payment except in her mind. Surprisingly, Marsha failed to present the clerk's records which would have established conclusively the exact amount of the record arrearage. Thus, although she established the total amount due over the entire period from February 1973 to November 1979 to be $17,980, she merely estimated she had received only $4,000, claiming $13,000 (an obvious miscalculation) still due and owing to her, and did not establish by appropriate record the basic arrearage amount.

With regard to the parties' financial status and John's petition for child support from Marsha, the trial court received evidence which indicated Marsha's salary then equalled or exceeded John's. The parties' testimony also disclosed Marsha had received a promotion, raises and overtime pay at her job since 1978 while John had experi-

enced layoffs at the Chrysler plant where he worked and faced the possibility of future layoffs. John's tax records for 1978, 1979 and 1980 were introduced and revealed he had experienced a drop in income of more than $6,000 in 1979, the first year he had the children, and that his gross income in 1980 was still less than it had been in 1978. In addition, the evidence indicated John was remarried and maintained a home for his wife, a daughter and a stepdaughter in addition to the three sons from his marriage with Marsha, whose school and extracurricular expenses were increasing as they grew older.

After trial, the court ordered Marsha to pay John $30 per week child support ($10 per week for each child), and entered its finding that John owed no support arrearage.

Although the testimony of John's co-workers and his sons tended to support no exact amounts of support payment by John, there was documentary evidence (cancelled checks) and admissions by Marsha supporting contributions of as much as $10,238.47.[2]

*Issue One—Modification of Divorce Decree—Change in Circumstances*

Marsha contends the trial court abused its discretion in modifying the decree arguing: 1) no evidence was introduced as to the circumstances on November 8, 1979, the date the parties modified the divorce decree to switch custody to John and 2) the evidence was insufficient to support a finding of changed circumstances.

By statute, a trial court may change an order relating to child support upon a showing of changed circumstances "so substantial and continuing as to make the terms unreasonable." Ind.Code 31–1–11.5–17, *Carlile v. Carlile,* (1975) 164 Ind.App. 615, 330 N.E.2d 349.

Our function on appeal from an order modifying the support provisions of a divorce decree is to determine whether the trial court has abused its discretion. *Id.* We cannot of course, weigh the evidence or judge the credibility of the witnesses, but must consider only the evidence or reasonable inferences most favorable to the trial court, and if from that perspective, there is substantial evidence to support the finding of the trial court, we affirm its decision. *Meehan v. Meehan,* (1981) Ind., 425 N.E.2d 157.

Additionally, we will find an abuse of discretion only when a modification is clearly against the logic and effect of the circumstances before the trial court. *Tucker v. Tucker,* (1980) Ind.App., 406 N.E.2d 321. Such is not the case in the

**2.** Marsha admitted John made continual payments of the rent from the time of his second marriage. Although the date of this marriage is not disclosed, John's cancelled checks indicate the rental payments began at least as early as August 1976, and, by Marsha's admissions, continued until May 1979, the date custody was changed. The rental payments paid by John averaged about $200.00 per month, or $6,600 over a 33-month period.

Further, John brought in cancelled checks written directly to Marsha amounting to about $3500. He also introduced other checks representing payments on a washing machine for Marsha and the boys of $138.47, which could have been considered a necessity. We disregard other insignificant amounts as non-necessities or as payments to benefit Marsha rather than the children (such as the payment of a traffic ticket).

As we will discuss later in the opinion under Issue Two, a serious problem in this case is Marsha's failure to introduce the clerk's records to establish the alleged arrearage. We would note her initial figure of $17,980 as the total obligation due without payments was correctly calculated from the date of the divorce to November 1979, when the court approved the change of custody to John. But we must observe in this regard that this amount included support obligations for the months of May through November, 1979 when the children were in John's custody by agreement. Under *Isler v. Isler,* (1981) Ind.App., 422 N.E.2d 416 reh. den. Ind.App., 425 N.E.2d 667, the court could have credited John for the amount due during this period. This would amount to $1,680 which reveals a total credit due John of $11,918.47 without considering John's testimony that he had made direct payments to Marsha both in cash and by checks other than those he was able to produce in court in addition to the payments evidenced by the cancelled checks. Some cash payments were admitted by Marsha and corroborated by John's co-workers.

instant appeal. When faced with a petition to modify a child support provision, the trial court must consider the totality of the circumstances involved in order to ascertain whether a modification is warranted. *Jahn v. Jahn,* (1979) Ind.App., 385 N.E.2d 488. As noted above, the testimony adduced at trial revealed a drop in John's income during the period in question which made it difficult for him to provide support for his maturing three sons, his daughter and stepdaughter. This, coupled with job insecurity and lay-offs at his employment with Chrysler Corporation and considered with the evidence relating to Marsha's more favorable financial situation, was sufficient to find a change of circumstances making the earlier modification (which required no support contribution by Marsha) unreasonable.

Viewing the above from the perspective of appellate review, we cannot say the trial court abused its discretion in modifying the support order.

### Issues Two & Three—Arrearages, Payment Directly to Marsha and to Third Parties

Marsha next argues the trial court erred in finding there was no support arrearage. In this regard, she contends the court improperly credited John for payments he made directly to Marsha and to third parties which did not conform to the original support order which required payments to be made to the clerk of the court. She also urges the trial court improperly admitted checks to third parties into evidence at trial.

In support of her argument, Marsha refers us to two opinions from the Second District of our Court which instruct that payments which do not conform to the terms of a support order requiring payments directly to the clerk of court will not be allowed as credits upon a support arrearage, *Whitman v. Whitman,* (1980) Ind.App., 405 N.E.2d 608 and *Breedlove v. Breedlove,* (1981) Ind.App., 421 N.E.2d 739. In *Whitman,* Judge Shields refused to credit a husband for expenditures for clothing, toys, food and entertainment which he had voluntarily furnished to his children. After analyzing the conflicting opinions from other jurisdictions, she indicated that a rule disallowing credit was to be favored, in order to promote predictability and certainty in child support payments.

In arriving at her decision, Judge Shields relied in part upon certain language in *Stitle v. Stitle,* (1964) 245 Ind. 168, 197 N.E.2d 174, a case not directly on point under the factual circumstances presented in *Whitman* or in this action. *Stitle* dealt with a situation where an obligated father decreased his support payments to the clerk pro rata after the first of his two sons graduated high school. The Supreme Court concluded the older son, then attending a university, was *not* emancipated, and thus the father "was required to make the payments in the manner, amount and at the times required by the support order . . . ." *Id.* at 182, 197 N.E.2d at 182–83. Thus, in *Stitle,* unlike the case at bar, there was no agreement by the parties to an alternate form of payment but rather a unilateral decision by the father to suspend payments to the clerk for his assertedly emancipated son. The significant issue addressed in the *Stitle* decision was the amount of the obligation rather than the mode of payment.

In *Breedlove v. Breedlove, supra,* Judge Shields reiterated the no-credit rule and held a husband was not entitled to credit for payments made directly to his children. The *Whitman* and *Breedlove* decisions do stand as some support for Marsha's arguments in this regard. However, we note the Districts of this Court have recently split on the issue of non-conforming payments.

In *Castro v. Castro,* (1982) Ind.App., 436 N.E.2d 366, (Staton, J. dissenting) the Third District rejected the *Whitman* rule and credited a husband for direct payments he had made to his ex-wife. The *Castro* court dealt with a payment dispute arising from the couples' 1975 divorce decree which ordered the husband to make bi-weekly payments to the clerk of the court. The husband testified he had made direct payments to the wife when he missed payments at the clerk's office, but indicated he had de-

stroyed his receipts dating from 1975 to 1978 after the parties agreed to settle a prior support dispute in June, 1978. He was, however, able to produce receipts from the mother for direct payments made in 1980 (apparently a year not in dispute). Upon these facts, the Court allowed credit for the non-conforming payments. In discussing why the *Castro* majority chose not to follow *Whitman,* which had been approved by the First District in *Isler v. Isler, supra,*[3] Judge Garrard, stated the no-credit rule of *Whitman* and *Isler,* while seeking simplicity and a reduction of litigation, is "contrary to the basic grain of American jurisprudence and perhaps arrogates to the judicial system an importance in the daily lives of ordinary people which we neither do, nor should, enjoy." *Castro v. Castro, supra* at 367. In crediting the husband for the non-conforming payments, the court explained the existence and amount of any delinquency were substantive questions and that "[m]oney actually paid and received in discharge of a judicially declared obligation of support is just that." *Id.* at 368.

Finally, Judge Garrard noted that the problem of non-conforming payments and support arrearages was in essence an evidentiary one and held that any evidence of payment should be admitted by the trial court, instructing:

> "Of course, a receipt signed by the mother is much less open to dispute than a father's simple verbal assertion that he paid. But these are questions of weight and credibility, not of the propriety of the proof. Accordingly, they may and should properly be resolved by the trier of fact."

*Id.* at 368. The above-quoted excerpt was the subject of a dissent by Judge Staton. As in the majority opinion in *Castro* and the *Isler* opinion on rehearing, Judge Staton indicated that strict adherence to a no-cred-

it rule would be unjust, and equitable exceptions for substantial compliance with a trial court's support order should be allowed. However, he would limit the trial court's consideration solely to documentary evidence, such as cancelled checks or receipts from money orders or cashier's checks.

We agree with the position taken by the majority in *Castro.* However, we do not need to engage in a lengthy discourse regarding the pros and cons of the various decisions of this Court since the issue involved here was directly addressed by our Supreme Court in *Manners v. State,* (1936) 210 Ind. 648, 5 N.E.2d 300, wherein that court held an order making a support award payable to the clerk was "merely directory" and further, that it would be unreasonable to disallow payments made by an obligated father at the request of the mother. *Id.* at 652, 5 N.E.2d at 302. In *Manners,* the father appealed a criminal conviction for desertion of his minor children. The father was divorced from the children's mother under a divorce decree which awarded custody to the mother and ordered him to make support payments to her through the clerk of the court. At the criminal trial, the State introduced evidence regarding a deficiency in the payments at the clerk's office to prove the alleged desertion. The father, however, testified he had paid grocery bills *at his wife's request* which exceeded the amount due and owing under the clerk's records. Under these facts, our Supreme Court reversed the criminal conviction, instructing:

> "There is evidence that the father did not pay all of the support money required of him by the decree to the clerk of the court, and that only a part of it was so paid. There is undisputed evidence, how-

---

**3.** While the *Isler* court approved of the *Whitman* holding on its particular facts, in its opinion denying the husband's petition for rehearing it noted that the "seemingly inflexible rule" set forth by *Whitman* may be softened by equitable considerations and should not be applied under all circumstances. *Isler v. Isler,* (1981) Ind.App., 425 N.E.2d at 667, 669 (on rehearing). The court recognized an exception to the rule

forbidding credit for non-conforming payments where the obligated parent has taken custody of the child or children and has cared for them in his or her home. The court explained that, under those facts, the obligated parent could be seen as merely providing support "in a different manner under circumstances easily susceptible of proof." *Id.* at 670.

ever, that the father paid bills for groceries at the request of his wife, exceeding the deficiency in the payments to the clerk. Sole jurisdiction to determine whether the court's order has been complied with is in the court making the order. *The requirement that the money be paid into the clerk of the court is not of the essence of the order. It is merely directory, and if the mother accepted payments directly to her, in money or its equivalent, it could not reasonably be said that there was a failure to comply with the order.* All questions as to the sufficiency of the order, and as to whether it has been complied with, must be committed to the jurisdiction of the court in which the order was made." (Emphasis added.)

*Id.* at 652, 5 N.E.2d at 302.

■■■ While in general, we agree with the premise that support payments should be made in the manner prescribed by the support order, and would also agree with the *Whitman* decision that gifts, entertainment and other such incidental expenditures made by the non-custodial parent should not be credited against any support arrearages, we believe the *Manners* opinion confirms the *Castro* position that the question of payment should be decided by the trial court on the merits of the evidence presented to it and, under certain facts, equity requires a father be credited for non-conforming payments. In a situation where, as here, the parties have *agreed to and carried out an alternate method of payment which substantially complies with the spirit of the original support decree,* we find it would be unfair to refuse to credit the non-custodial parent simply because the payments were not made through the clerk.

■■■ In reaching our conclusion, we do not find it necessary to approve Judge Garrard's language in *Castro* that an uncorroborated "simple verbal assertion" by a spouse may be sufficient to prove payment. *Castro v. Castro, supra* at 368. Here, we have

a combination of cancelled checks, admissions of Marsha and corroboration by co-workers and by the parties' children, all of which establish that John was never behind in his support payments to Marsha. While Judge Staton would require documentary evidence in order to ensure the court that a support payment had actually been made, we would not be so restrictive here, especially where we have an admission by Marsha that rent payments were made in addition to documented direct payments to her.

Finally, a matter which can not escape our attention is the unfortunate posture in which the issue of arrearage was presented to the trial court, which court must base its ultimate decision on the facts actually established by the parties bearing their respective burdens. In the instant case, Marsha had the burden of proving a support arrearage. She offered no records of the clerk which, along with the orders of the court fixing payment, would have established a prima facie case for the amount thereof. *Castro v. Castro, supra.* Nor did she offer other corroborative evidence to support her admittedly sketchy estimations of John's payments and alleged arrearage, the records of which she conceded existed solely in her mind.

In his *Castro* dissent, Judge Staton indicated a prima facie case of arrearage could be established by the court taking judicial notice of its own support records, apparently considering the clerk's records of support payments as part of the record of the cause.[4] We would take exception to this statement. We first observe this duty of the clerk is among several others which could be considered non-judicial. Further, neither in Ind.Rules of Procedure, Trial Rule 77 (which outlines the duties of the clerk to include in the civil docket or order book such items as appearances, orders, verdicts, etc.) or in Ind.Code 31–1–11.5–13 (which requires the clerk to maintain rec-

---

**4.** He also noted the better practice would be authentication of the arrearage by the clerk's

record itself.

ords of support payments)[5] do we find any language or expression requiring the clerk to include support payment records within the records of each cause. Indeed, this Court has had occasion to observe numerous appeals involving support actions for which a praecipe requests and the clerk certifies the entire record and have yet to observe the inclusion of support payments as part of that record. Acts performed in the clerk's office outside the trial court's records have been held not to be entitled to judicial notice. See 21 C.J.S. *Evidence,* § 50, *Hyde v. Apple,* (1948) Tex.Civ.App., 209 S.W.2d 804.

Nonetheless, even if these records were held to be worthy of judicial notice, we observe that in the instant case, Marsha did not call the records to the court's attention and request judicial notice be taken of them. Further, there is no indication in that the trial court did so sua sponte. It is settled that a trial court should not take judicial notice of a matter without disclosing its intention to do so and allowing an opportunity for objection. *Belcher v. Buesking,* (1978) Ind.App., 371 N.E.2d 417.[6] Thus, the court could have found Marsha failed in her burden of proof on either the existence or the amount of the alleged arrearages, for it is by the clerk's records that a prima facie case is established, not the sketchy memory of a custodial parent.

In conclusion, although John in his response admitted payments other than to the clerk, it is clear from the testimony that Marsha agreed to accept the alternate payments as a substitute for the court-ordered arrangement, and that John's testimony regarding full payment was corroborated, either by testimony of others, by admissions or by receipts. A substantial number of the payments were admitted or documented, and John presented evidence other than mere testimonial assertions to prove payment. Marsha never suitably established the exact arrearage amount. By our calculations based upon Marsha's admissions and John's cancelled checks, if there was any arrearage, it occurred during the period from February 1973 to August 1976. John testified he was unable to obtain cancelled checks from his bank for this period as the bank retained customer records for only five years. He did, however, present corroborated testimony that he made a number of cash payments directly to Marsha during this period. In light of this testimony and the overwhelming evidence of John's course of conduct since that time, the judge could have properly found no arrearage existed.

The determination of the credibility of the witnesses and the weighing of the evidence is the task of the trier of fact. The judge's decision here reveals he believed the testimony of John and his witnesses. Our examination of the record indicates there was ample evidence to support his finding. From our perspective of appellate review, we can not say the trial court erred in determining John was neither in arrears nor in contempt.

For the foregoing reasons, the trial court's judgment is affirmed.

CONOVER, J., concurs.

NEAL, J. (sitting by designation) concurs.

---

**5.** IC 31–1–11.5–13 reads in part as follows:

"Payment of Support Orders. (a) Upon entering an order for support the court may require that the support payments be made to the clerk of the circuit court as trustee for remittance to the person entitled to receive payments.

(b) The clerk of the circuit court shall maintain records listing the amount of such payments, the date when payments are required to be made, and the names and addresses of the parties affected by the order.

(c) The parties affected by the order shall inform the clerk of the court of any change of address or other conditions that may affect the administration of the order. . . . "

**6.** Obviously in many of these cases the trial court would be dealing with voluminous support records. A judge who purported to take judicial notice of a record, without informing the parties and giving them an opportunity to review his action, might inspect the wrong support record or make an incorrect computation from the correct record.