In re the MARRIAGE OF David J. BRADACH, Appellant,
and
Patricia Bradach, Appellee.

No. 3–280A52.

Court of Appeals of Indiana, Fourth District.

June 25, 1981.

Rehearing Denied August 18, 1981.

Kenneth D. Reed, Abrahamson, Reed & Tanasijevich, Hammond, for appellant.

Gerald K. Hrebec, Fred M. Cuppy, George W. Carberry, Thomas, Burke, Dyerly & Cuppy, Merrillville, for appellee.

MILLER, Judge.

In this action David J. Bradach (husband), the petitioner in a dissolution of marriage proceeding concluded on February 1, 1978 by a final decree of the Jasper Circuit Court, appeals from a subsequent order by a special judge of that court dated September 27, 1979 setting aside the "Property and Custodial Agreement" of the parties in response to a motion filed by Patricia Bradach (wife) pursuant to Ind. Rules of Procedure, Trial Rule 60(B). The wife alleged, *inter alia*, the husband misrepresented the marital assets of the parties. The husband also contends the trial court's later order wrongly directed him, in a consolidated claim, to pay $800 "support arrearage" and the wife's attorney's fees in obtaining such judgment. We conclude, as discussed below, there was insufficient evidence of fraud or material misrepresentation elicited at the hearing on the wife's T.R. 60 motion to support the decision to set aside the property provisions of the decree, and that a new trial on the wife's motion should be held. Since we further determine the court correctly ordered the husband to pay past-due support obligations and the wife's attorney's fees for prosecuting such claim, our decision affirms in part and reverses in part the trial court's determination.

### FACTS

The pertinent facts of the husband's appeal may be summarized as follows: On February 4, 1977, the husband instituted proceedings for dissolution of the parties' 11-year old marriage, during which two children were born, by filing his petition in the Lake Circuit Court alleging the parties had separated on February 1, 1977 and that their marriage was irretrievably broken. Thereafter, also in February, the wife hired her own attorney, and upon her motion the cause was venued to the Jasper Circuit Court. Various reconciliation efforts evidently followed, during which the parties resumed living together as husband and wife. This arrangement apparently lasted from May until August, after which, according to the wife, some additional attempts at reconciliation continued, including a period when she and her husband were "living partially as husband and wife." The wife stated "I just didn't think that it [their dissolution of marriage] would ever happen," although she did not contradict

the husband's assertion that in October of the same year, both parties met in Naples, Florida without their attorneys for the purpose of arriving at a property settlement based on conversations they had while living together. This same property and custodial agreement was ultimately approved by the trial court in December of 1977 and incorporated by it into its February, 1978 final decree. In November, after the parties returned from Florida, the wife discharged her attorney pursuant to the husband's request,[1] stating in her letter to him she would no longer need his services because "I have had an opportunity to sit down with my husband David and discuss the manner in which we are going to divide our property."

As noted above, the trial court ultimately held, after first approving the parties' property agreement and incorporating it into a final decree of dissolution, that the husband had misled the wife by concealing his property and enticing her to dismiss her attorney as part of a "fraudulent" scheme to "deny to the wife a fair portion of the parties' accumulated marital estate." Significant to the court's decision, we note, in this regard, that before the wife's attorney was discharged he took an oral deposition in September of 1977, later introduced at the hearing on the wife's T.R. 60(B) motion, in which deposition the husband, a certified public accountant, was questioned in some detail in the presence of the wife regarding his own financial affairs and those of the family.[2]

Evidently, the trial court's decision relied largely on alleged discrepancies between the evidence elicited at the T.R. 60(B) hearing and statement made by the husband in the earlier deposition regarding an entity called Partnership Jupiter, with respect to which the wife maintains (as the trial court held) the husband misled her in his deposition by stating he had no "interest" except as a trustee. In its lengthy findings and order setting aside the property provisions of the final decree, the trial court made the following determination, which we quote prior to considering the particular statements made by the husband in his deposition and at the T.R. 60(B) hearing:

"Prior to his discha[r]ge, Respondent's then counsel took the Petitioner's deposition, attended by the Respondent, questioning him therein as to his assets including, specifically, an interest in the so-called Scheisser Farm, in [sic] interest the Petitioner therein described as trustee, pursuant to a certain trust agreement, or a certain Partnership Jupiter. The Petitioner was at that point requested to furnish to Respondent's counsel a copy of the Trust Agreement, which he agreed to do, but none was ever in fact produced until the hearing had this date. Preceding the execution of the parties' 'Property and Custodial Agreement', the parties had discussed their assets. At no time therein, however, did the Petitioner characterize his interest in the Scheisser transaction as other than a trustee, a representation upon which the Respondent relied. Had she then known his true interest therein, she would have not executed the 'Property and Custodial Agreement'.

The Petitioner at no time subsequent to the discharge of her counsel suggested to her that she have successor counsel or advice with respect to the 'Property and Custodial Agreement'.

The Respondent does not deny that she read and understood the 'Property and Custodial Agreement' before its execution, and that she so stated at the final hearing. It should be noted that that document was prepared by the Petitioner and thereafter drafted in its final form

---

1. The husband, a county councilman, testified at the hearing on the wife's T.R. 60 motion he had asked her to consider the removal of the particular attorney she had hired because he feared that individual "would like to make a little hay with the Bradach name" so as to thwart the husband's political aspirations.

2. In this regard, the husband stated he kept the books and financial records for the family as well as for his own accounting business.

by his attorney. Its concluding paragraph provides '. . . that said agreement has been entered into with complete knowledge of all assets acquired by either side during coverature. . . .'

Notwithstanding the Petitioner's representations, however, with respect to his limited interest in the Scheisser transaction, the documentary evidence presented at this hearing unequivocally, established that, from the 22nd day of March, 1977, he owned a beneficial '⅕ interest in common' therein along with others, in a certain 'Partnership *Juipter* [sic]', the subject-matter thereof being the farm, for which the purchase price was some $525,-000.00 paid-in capital $50,000.00; interestingly, Petitioner was one of the obligors of the note and mortgage thereon. It is undisputed that he had received, as to the subject-matter of that trust, apparently from the other beneficiaries, a finder's fee of $15,000.00. It is his position, however, that he had no monies invested in it, or credited to him, until October of 1978, at which time, he testified he borrowed $25,000.00 from the Gary National Bank and acquired for the first time the 20% interest therein. He further testified that there was a 'gentlemen's agreement' among the partners that he would be permitted to acquire an interest therein, provided he pay his way. It is revealing, however, that the Petitioner produced no documentation with respect to the transaction of October 1978, or the loan by which he purportedly acquired the monies therefor.

The Respondent first learned of the Petitioner's interest in the Trust from a newspaper account, in mid-January, 1979, of his appearance before the Plan Commission of the Town of Merrillville, Indiana, before which he unsuccessfully petitioned for the re-zoning of the farm land constituting the corpus thereof (the denial of which gave rise to his subsequent filing of a complaint in *the* Superior Court of Lake County seeking certiorari, declaratory and injunctive relief, in which *verified* pleading he described himself as an owner of the subject property from

the time of its purchase). She immediately thereafter sought counsel, resulting in the prompt filing of the instant motion."

As noted above, the trial court also determined the husband owed $800 in past-due support and ordered him to pay such amount plus the wife's attorney's fees in prosecuting the claim for support.

*Statements in the Deposition*

Evidently, the conclusions of the trial court, quoted earlier, were based on the husband's statement in the deposition that his interest in the Jupiter partnership or related real estate amounted to "nothing" at the time the deposition was taken because he acted merely as a "trustee for the group," although we also note he *did* admit in the deposition, in testimony not acknowledged by the trial court, his signature appeared on a $525,000 note, a trust agreement, a mortgage and the articles of partnership pertaining to Partnership Jupiter and the real estate being acquired. In this regard, the following colloquy occurred during the deposition:

"Q. So if you signed on the mortgage you have an interest in the title to that form?

A. If you want to claim so—I won't have a division of the profits on the partnership."

The husband stated, again in his deposition, he had in fact received a finder's fee for organizing the deal to acquire the Scheisser farm. He also asserted, however, that instead of investing a portion of the fee into the partnership as he had originally planned, he ultimately concluded such action was not prudent because of the anticipated dissolution of his marriage. In this regard he stated, "[t]he documents may be weak, but my ownership was taken out." According to the husband, the original arrangement was for him to invest $10,000 into the deal along with his brother and step-father, but that instead, the latter two individuals invested only $15,000 each as part of the total $50,000 capital acquired for the deal. Other evidence in the deposition described, in apparent detail, additional assets or potential interests of the husband, and such evidence included exhibits which

described, among other things, the "estimated income" of the husband as of May 23, 1977,[3] as well as a personal financial statement itemizing the value of his own business and various personal property and real estate interests which he held.

*Evidence at the Hearing on the Wife's Motion*

At the later hearing on the wife's T.R. 60(B) motion, the husband testified, consistent with his position in the instant appeal, his statements during the deposition had "accurately, fairly and fully" described his assets and any connection he may have had at that time with Partnership Jupiter. As the trial court's order revealed, the husband asserted at the hearing that in October of 1978, he did in fact acquire an interest in Partnership Jupiter by borrowing $25,000 from the Gary National Bank.[4] The husband stated he ultimately made this investment in part in order to preserve his reputation "if things turned out badly," and by his account the belated contribution was furnished pursuant to a "gentleman's sort of agreement" that he "would have part ... someday" provided he "came up with money to put in just as they did." He further asserted "I wasn't getting something for nothing."

Other significant evidence elicited at the hearing included a verified complaint, specifically mentioned by the trial court in its findings and order, which the husband filed in the Lake Superior Court in January of 1979 (when the husband admitted owning a 20 percent interest in the deal), alleging the purchasers of the Scheisser farm were entitled to relief by virtue of zoning changes made by the Town of Merrillville and its plan Commission.[5] Significantly, however, and in contrast to the description of such complaint made by the trial court, the complaint did not specifically describe Bradach as an *original* purchaser of the property, and in fact identified the named "Plaintiffs" as "DAVID J. BRADACH, PARTNERSHIP JUPITER, BANK OF INDIANA, As Trustee under Trust No. 6049," a designation not necessarily inconsistent with Bradach's representation he acted as "trustee" for the group, since particular purchasers were not identified as parties to the suit. The husband also stated at the hearing he had not supplied a copy of the Trust Agreement as requested at his deposition because, upon investigation, he discovered the copy he thought was in his possession was in fact held by the Bank of Indiana.

## ISSUES

As noted above, the husband contends in the instant action the trial court erred when

---

3. This included, what at that point appeared to be a projected income of $28,000 attributed to Partnership Jupiter, as well as some $35,000 described as follows: "Bal on Scheisser 60M (25M) = $35,000." In his deposition, the husband stated he received a finders fee of $60,000 "for putting together a group to buy the Scheisser farm." We note in this context that in her brief, the wife makes the following statement, the significance of which is not explained with respect to her claim the husband detrimentally misled her at the deposition: "Although David testified at the time of the hearing on Patricia's Motion under Trial Rule 60 that all he had received was a finder's fee [of $15,000] in February or March of 1977, at the time of his deposition in September of 1977, he stated that he had received a $60,000.00 finder's fee when Partnership Jupiter purchased the Scheisser Farm."

4. The husband stated that at the time of the hearing he had paid only the interest on this loan. He further asserted this sum was paid by check, although the trial court noted he "produced" no documentation pertaining to this $25,000 transaction.

5. Paragraphs 3 and 4 of the complaint stated:

"(3) At the time plaintiffs purchased the subject land, for the specific purpose of owning, using and selling same, for and under the then applicable District Use Regulations, said land was accorded zoning classification by defendants of M–1 Industrial and R–3 Multi-Family Residential.

(4) During the interim, and since said purchase, defendants have purported to take action to adopt a 'new' Master Plan, under the terms of which plaintiffs said lands are purportedly 'rezoned' or 're-master planned' to limit the District Use Regulations thereof to a zoning classification of A–1 Agricultural and R–1 Single Family Residential and Conservancy, rendering the land wholly unusable to plaintiffs and diminishing its value immensely."

it 1) set aside its earlier dissolution decree pursuant to the wife's motion under T.R. 60(B); and 2) ordered the husband to pay alleged support arrearage and the wife's attorney's fees. In his brief he argues the evidence adduced by the wife during the hearing in support of her case in chief was insufficient to establish the requisite elements of either actual or constructive fraud, since the wife's "mere suspicions that David had an interest in property which he failed to disclose to her, would not be sufficient to sustain the burden of proof on her Rule 60(B) motion." Additionally, he maintains he was never behind in his $100 per week support payments under the original decree, since for a time he paid $500 per month. The wife contends she sustained her burden of proof on both of these issues. Our analysis treats such questions in the order discussed by the parties.

## I.

Nowhere in the wife's T.R. 60(B) motion does she describe which of the eight subdivisions of the Rule forms the basis for her complaint, the general tenor of which is that "the Respondent [wife] was deceived, mislead and under stress and under influence of Petitioner at the time that she executed the property agreement." Thus, Paragraph 2 of the motion alleges, for example, "[t]hat at the time the property agreement was executed, Respondent was not represented by counsel and due to her mistake, surprise, excusable neglect and due to misrepresentation and other misconduct of the Petitioner, her consent to the agreement was in fact not voluntarily given," a series of claims which might justify relief under either T.R. 60(B)(1), (2) or (3),[6] or all of these subsections. Evidently, however, the trial court considered her motion (as have the parties in their arguments on appeal) exclusively as one made under T.R. 60(B)(3), involving claims of fraud or misrepresentation, with respect to which the court noted "[t]he Respondent's Motion for Relief from Judgment is sufficiently pleaded, pursuant to Indiana Rules of Procedure, Trial Rule 60(B)(3), to invoke the jurisdiction of this Court with respect thereto, alleging, as it literally does, 'misrepresentation.'"[7]

6. These subsections state:
   (B) On motion and upon such terms as are just the court may relieve a party or his legal representative from an order, entry or default, proceeding, or final judgment, including a judgment by default, for the following reasons:
   (1) mistake, surprise, or excusable neglect;
   (2) any ground for a motion to correct error, including without limitation newly discovered evidence, which by due diligence could not have been discovered in time to move for a motion to correct errors under Rule 59;
   (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ....

7. Although the husband asserts on appeal the wife's motion failed to state a claim and that it was not supported by sufficient evidence of fraud, he does not now contend, in contrast to the position taken in his Motion to Correct Errors, the court lacked jurisdiction to entertain the wife's motion. He earlier contended such jurisdiction was lacking because 1) in alleged violation of the one-year filing requirements of T.R. 60(B)(8) (although no authority is cited) "more than one year had elapsed from the time the parties entered into the property agreement *and filed it in open court* until the

filing of the wife's motion; and 2) the wife did not specifically allege "fraud" in her motion, as is purportedly required by *Covalt v. Covalt*, (1976) 177 Ind.App. 37, 354 N.E.2d 766 and Ind.Code 31–1–11.5–17, where it is stated "[t]he orders as to property disposition entered pursuant to section 9 [Ind.Code 31–1–11.5–9] of this chapter may not be revoked or modified, except in case of fraud which ground shall be asserted within two (2) years of said order." (Emphasis in original.) With respect to these claims we do observe, however, that the wife's motion for relief was brought within one year of the date the property settlement was incorporated into the *final decree*, since such motion was filed on January 24, 1979, and, in addition, the motion which she filed stated, as indicated above, she had been "misled" by virtue of "misrepresentation and other misconduct" by the husband regarding the parties' marital property. Under the factual circumstances alleged, we believe such claims were sufficient under liberal pleading rules to invoke the "fraud" exception to the general rule stated in Ind.Code 31–1–11.5–10 to the effect that, absent such fraud, a property agreement incorporated into a final decree may only be modified pursuant to the parties' own consent or the terms of the agreement itself. IC 31–1–11.5–10(c). *See generally Pactor v. Pactor*, (1979)

■ Our application of the law to the facts of the instant case draws considerable support from the analogous situation presented in *Covalt v. Covalt*, (1976) 171 Ind.App. 37, 354 N.E.2d 766, where the wife similarly alleged she was without counsel and that her husband misled her regarding the value of the parties' marital estate. As the Court there stated, the applicable question is whether the trial court's decision that there was fraud or misrepresentation, as alleged, was "clearly erroneous" within the meaning of Ind. Rules of Procedure, Trial Rule 52(A). That Rule provides, in part, "[o]n appeal of claims tried by the court without a jury or with an advisory jury, at law or in equity, the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

In *Covalt*, where this Court held the trial court had erroneously found evidence of fraud, the facts were as follows: Initially, the parties met with the husband's attorney, who was also a social friend, and at that time, the attorney told them he would have to represent the husband if any dispute arose. Evidently, no such dispute occurred, since sometime thereafter the parties filed their jointly executed Property Settlement Agreement accompanied by the husband's petition for dissolution of marriage, with no indication of the wife having ever obtained counsel of her own. The terms of that property agreement stated that in return for a $5,000 payment to the wife, the husband would receive the parties' house, originally purchased for some $26,-000, subject to future mortgage payments. Thereafter, the husband lost his job and told his wife it looked like he was going to have to sell the house for a loss because he had two appraisals made which showed it had a value of $21,000 or $24,000. The wife then contacted the attorney and told him she wanted to release the husband from his obligation to pay her $5,000 because she wanted to be fair to him "as he was going to spend his time and money to improve the property and she desired to avoid a mortgage deficiency for which she would be jointly liable." *Id.* at 39, 354 N.E.2d at 767. Accordingly, an amendment was added to the property settlement agreement, and on the same day such amendment was filed, the court entered its final decree of dissolution of marriage. Significantly, there was evidence that during the following months, the husband worked ten hours a day seven days a week and invested some of his own funds for materials in improving the property. On April 30, 1974, after the wife discovered the house had been listed with a realtor for some $36,900, the wife filed her T.R. 60(B) motion alleging she was entitled to an additional $5,000 cash settlement because she had signed the amendment to the property settlement agreement without benefit of counsel or full disclosure by the husband or his attorney regarding the full value of the house, which the evidence showed was ultimately sold for $34,500. The trial court ordered judgment for the wife, and on appeal, as noted earlier, this Court reversed because "there was no evidence whatever that the house was worth more on the day Karen relinquished the Five Thousand ($5,000.00) Dollars by signing the Amendment to Property Settlement Agreement than either she or Joseph believed it to be worth." *Id.* at 45, 354 N.E.2d at 771.

■ Here, as in *Covalt*, we believe there was no evidence presented at the appropriate hearing to support the trial court's conclusion the wife had been actionably misled by the husband regarding his property interests, either at his deposition or in other statements to the wife. In both cases, the question was whether there was

Ind.App., 391 N.E.2d 1148, 1152, a case dealing with the requisite elements of a fraud allegation in order to set aside a property settlement agreement, in which the court stated "we do not feel the 'pleading' requirements should be any more stringent than the notice pleading requirements for a complaint," and that "even if the averments of fraud fail to comply with the special pleading provisions of Indiana Rules of Procedure, Trial Rule 9(B), such defect is not fatal," since other remedies short of dismissal are available.

"actionable" fraud—that is, a false and material representation regarding a past or existing fact, made with knowledge or recklessness so as to produce a detrimental reliance. *Covalt v. Covalt, supra* at 45, n. 12, 354 N.E.2d at 771, n.12. While it is true in each instance that the husband's interests in fact changed from what was apparent when the settlement agreement was arrived at, in neither case was there any showing such a change was due to deception, or to anything other than the additional labor or capital supplied by the husband after the parties' dissolution of marriage, even assuming *arguendo* there was a detrimental reliance. And as this Court concluded in *Covalt*, "[c]ertainly there is no actual fraud for there is no misrepresentation of a present existing material fact." *Id.* at 45, 354 N.E.2d at 771.

Thus, as we have earlier indicated, the husband in the case at bar informed his wife he had received a finder's fee in connection with the Partnership Jupiter deal, and that his name appeared on various documents pertaining to the partnership and to the purchase of the Scheisser farm, including the mortgage and a note for over $500,-000. Evidently, however, the wife, an apparently well-educated dental assistant, made no effort to determine whether the husband's story that his ownership was "taken out" was true. In this regard, the wife presented no evidence at the hearing on her motion—by questioning the other parties to the Jupiter transaction, attempting to obtain documents of the $25,000 loan received by the husband, or otherwise—tending to contradict the husband's story that he never actually invested in the partnership until sometime after the dissolution in 1978. Similarly, a determination of fraud or misrepresentation is also not supported by the additional fact, noted by the trial court, that at some later date after the

decree, the husband was a named plaintiff (not specifically identified as an original purchaser) in a rezoning action involving the property in question. As we have already concluded, the language of the rezoning complaint is ambiguous at best, since it names no other "purchasers" and is generally consistent with the husband's assertion he acted as "trustee" for the group.[8]

■ The husband having offered a plausible explanation for his actions, we believe, as the Court held in *Covalt*, where the wife did not utilize her own attorney or other experts to investigate her suspicions or substantiate her claims, the resulting situation "does not necessarily lead to the conclusion that she was defrauded." *Covalt v. Covalt, supra* at 46, 354 N.E.2d at 771. See also *Crispin v. Crispin*, (1975) Tex.Civ.App., 529 S.W.2d 310, 313, where the Court, in sustaining the trial court's determination the wife had failed to prove the legal requirements necessary to support a bill of review, concluded the wife, who knew she could have employed counsel, "failed to show that Crispin by any act of his deceived or misled her, except by her general testimony that Crispin did not discuss financial matters or business operations with her," and that "[i]t would have taken very little effort on her part for Mrs. Crispin to ascertain the net value of the marital property prior to the settlement." *Id.* at 314.

■ While it is true in the case at bar the trial court concluded the husband used his "superior" position to induce the wife to discharge her attorney, that he did not *suggest* to her that she hire new counsel, and that he "persuaded the Respondent that he would provide for her and the parties' children beyond the terms of the agreement," we do not believe the facts in evidence entitled the wife to relief on a theory of duress or undue influence.[9] By the wife's

---

**8.** Arguably, the wife might have contended the husband owed her a duty to disclose any valuable "option" he had to buy into the Jupiter transaction, although no evidence was presented at the hearing which suggested the "gentleman's sort of agreement" described by the husband was anything but a verbal, non-binding understanding incapable of being enforced with respect to the real estate being acquired. In any event, as we conclude *infra*, the wife further failed to show how, if at all, she was harmed by any alleged omission.

**9.** Indeed, the evidence suggests, at least with

own admission, the husband merely encouraged her to discharge the services of one particular attorney who the husband felt would act adverse to his political career,[10] and in no way did he *prevent* her from obtaining the services of any attorney. Moreover, even assuming, as the trial court apparently did, the wife's allegations the parties were "partially" living together established a confidential relationship requiring that any property agreement must be "fair and reasonable," [11] the essentially uncontroverted evidence suggested no advantage was gained by the husband, and thus that the wife was not harmed. Thus, although there is some difference of opinion among courts regarding presumptions and burdens of proof with respect to fraud, undue influence, and overreaching exercised by a husband on his wife, 41 Am. Jur.2d *Husband and Wife* § 275 at 227 (1968), the rule protecting the wife, even

where it is recognized, provides merely that "*any advantage* to the husband from such a transaction is presumed to have been obtained by fraud, undue influence, or over-reaching, and that the burden of proof is on him or his representative to prove the absence thereof; . . . ." [12] (Emphasis added.) In the instant case, where the wife conceded even at the time of the hearing on her motion she was unsure what interest the husband may ever have had in the so-called Scheisser transaction, it is evident that no inference of unfairness or advantage is suggested, but rather, all of the evidence was to the contrary.

■ Thus, we conclude the trial court acted erroneously in setting aside the property provisions of the earlier decree, and must have based its judgment on mere guesswork and speculation since the wife failed to present any evidence that she was misled or coerced, that the husband exerted

---

respect to this latter allegation, the husband did (for a time) make support payments in excess of those provided by the original final decree, that he paid real estate taxes and insurance premiums, and that he provided the wife with various credit cards, all in excess of the express terms of the parties' property settlement agreement. In this regard, we also note the rule pertaining to evidence of "duress" within the marital relationship to the effect that "if the threats are coupled with promises, though false, that the wife shall have the benefit of her act, then such duress is not ground for granting her relief from her act." 41 Am.Jur.2d *Husband and Wife* § 143 at 124 (1968).

**10.** In this regard, the husband acknowledged he would be unwilling to enter into a property settlement so long as the wife was represented by this particular attorney. He stated, "I have never heard of anybody that thought his settlements were fair . . . ." *See* 25 Am.Jur.2d *Duress and Undue Influence* § 18 at 375 (1966), where it is stated "it is not duress to threaten to do what one has a legal right to do."

**11.** The wife stated, with some ambiguity, that the husband moved out in August of 1977, "but not completely," and that so far as she was concerned, the parties were working towards a reconciliation even after the September deposition. *See* 24 Am.Jur.2d *Divorce and Separation* 1016 (1966), where it is stated, in a passage quoted in the trial court's findings and order:

"When a Husband and Wife are *living together* as such, and they make a contract, they occupy a confidential relationship, or a

relationship of trust and confidence, and it is generally assumed that the Husband has a dominant influence over the Wife, for which reason it is held that a contract to be valid, must be fair and reasonable to the Wife." (Emphasis added.)

Insofar as it applies to a husband and wife, the term "living together"

"does not always mean a common place of living, but means living as husband and wife with voluntary recognition of the relationship, and *no design or agreement to live apart with the chief end in view that of living apart free from reciprocal marital rights and duties.*" (Emphasis added.)

41 Am.Jur.2d *Husband and Wife* § 8 at 24 (1968).

**12.** The cited annotation also concludes:

"Other courts take the view, at least in jurisdictions where a married woman may contract with her husband as though they were not married and where she can contract generally as a feme sole, that there is no such presumption or burden of proof on the husband or his representative, and that such a transaction is presumptively valid and effectual without proof aliunde of its equity and justice, the burden of proving fraud, coercion, or undue influence being on those who attack the validity of the conveyance or transfer. It has been asserted the mere fact of the marital relation itself does not raise such a presumption or cast the burden of proof on the husband . . . ." *Id.*

any undue influence on her, or in fact that she suffered any detriment from his alleged actions. *See Covalt v. Covalt, supra* 171 Ind.App. at 45, n.12 and accompanying text, 354 N.E.2d at 771; and see *McFarland v. Phend & Brown, Inc.,* (1974) 161 Ind.App. 695, 698, 317 N.E.2d 460, 462, where the Court stated, in ruling on a T.R. 60(B)(3) motion, "the misrepresentation must be made as to a material fact which would change the trial court's judgment." On its face, the trial court's order determined merely that some misrepresentation did occur, leaving the issue of how, if at all, she was harmed to future discovery and negotiation between the parties. Thus, the order stated the decree should be "revoked, vacated, setaside [sic] and re-opened, *and the parties hereto directed to forthwith commence discovery and negot[iat]ion and resolution thereof*" (emphasis added), language suggesting the wife would be able to renegotiate the original property settlement even in the event it was determined she was not harmed by any fraud on the husband's part.

■ Accordingly, it is evident the court's decision on such motion must be set aside. Since it also appears from the record, however, that "it is possible that in another trial additional evidence could be presented which might sustain her contentions," *Bizik v. Bizik,* (1953) 124 Ind.App. 146, 165, 112 N.E.2d 760, 762 (on petition for rehearing), our conclusion is that a new trial on the wife's T.R. 60 motion should be held, and that at such hearing, the wife should be required to prove, if possible, in what specific manner she was actionably coerced or misled, and how any material misrepresentation or omission by the husband was relied upon to her detriment. It may be assumed, for example, that the parties would seek to determine what documenta-

tion, if any, supports the husband's assertion that he borrowed $25,000 in 1978 to invest in the Jupiter transaction, and that they would also attempt to elicit testimony from other individuals involved in the deal, along with evidence pertinent to establishing the value of any allegedly concealed interest.[13]

## II.

The final issue raised by the husband is whether the trial court further erred in ordering him to pay a support arrearage of $800 and fees of $400 to the wife's attorney for prosecuting her claim. We conclude that it did not.

■ Significantly, the husband does not directly challenge the *amount* of the judgment awarded, but rather argues merely that in computing any alleged arrearage based on his failure to make *any* payment in February or March of 1979 the trial court should have considered the fact that he overpaid his support obligation during 1978 [14] and that he "contributed substantial other property and money during this period of time to the benefit of Patricia." With such conclusions we cannot agree. As this Court has recently had occasion to observe, in *Haycraft v. Haycraft,* (1978) Ind.App., 375 N.E.2d 252, 255, where the husband requested "credit" for some 139 consecutive weekly overpayments of $5.00 each, the purpose of establishing a regular schedule of support payments is one of "providing regular, uninterrupted income for the benefit of that parent's children, who are in the custody of another," and in this regard, "[t]he regularity and continuity of court decreed support payments are as important as the overall dollar amount of those payments." Obviously, it is of little merit, with respect to this goal, that at some earlier time the party bearing the obligation paid

---

**13.** In attacking the ruling on the wife's T.R. 60 motion, the husband does not allege any part of the $400 attorney's fees awarded to the wife were incurred in maintaining such motion, and accordingly we must conclude these fees are wholly attributable to the wife's consolidated claim for support arrearage and legal fees incident thereto, which fees the husband does attack.

**14.** In this regard, the court found, in its order setting aside the earlier decree, that the husband "paid support of $500.00 per month, although the decree obligated him to $100.00 per week, until . . . the initiation of this proceeding, when all support payments ceased for a period of some sixty days."

more than he had to, and of no consequence whatsoever that property was contributed "to the benefit of the *wife*" (emphasis added), since it is the welfare of the dependent children rather than the relative financial well-being of either of the individual parents which support payments are designed to serve. Accordingly, the settled law of this state, which the husband has failed to distinguish from the circumstances of the instant case, is that a noncustodial parent is " 'required to make the payments in the *manner, amount* and at the *times* required by the support order embodied in the divorce decree, *at least until such order was modified or set aside,*' " *Haycraft v. Haycraft, supra* 375 N.E.2d at 255 (emphasis in original), *quoting Stitle v. Stitle,* (1964) 245 Ind. 168, 182, 197 N.E.2d 174, 182–83, and any excess under a contrary agreement between the parties must be viewed as a gratuity or as a voluntary contribution for the support of the children. *Haycraft v. Haycraft, supra.*

For the foregoing reasons and authorities the decision of the trial court is affirmed in part and reversed in part, and the cause remanded for further proceedings consistent with this opinion.

YOUNG, P. J., and CHIPMAN, J., concur.