**In re PATERNITY OF W.C., b/n/f**

**P.S., Appellant–Respondent,**

**v.**

**W.C., Appellee–Petitioner.**

No. 82A04–1008–JP–496.

Court of Appeals of Indiana.

July 29, 2011.

Garvin D. Senn, III, Legal Aid Society of Evansville, Inc., Evansville, IN, Attorney for Appellant.

Michael H. Hagedorn, Hagedorn Law Office, Tell City, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

P.S. ("Mother") appeals the trial court's order suspending her parenting time and any other contact with her minor child. Because W.C. ("Father") failed to present evidence justifying suspension of Mother's parenting time, we conclude that the trial court abused its discretion. We therefore reverse and remand.

### Facts and Procedural History

Mother and Father have one child together, W.C., who was born February 14, 2000. W.C. has been diagnosed with autism spectrum disorder.

Father admitted paternity of W.C. in 2002 and was given parenting time according to the Indiana Parenting Time Guidelines. In March 2009, Father filed a petition to modify custody, which was granted in August 2009. The record does not reveal why custody was modified or what Mother's parenting time schedule was when Father gained custody.

In May 2010, the trial court issued an order modifying Mother's parenting time to visits on Sundays from noon to 1:00 p.m. at McDonald's in Tell City, Indiana, supervised by Father, and telephone contact on Wednesdays between 3:00 p.m. and 5:00 p.m. with the length of the calls limited to W.C.'s attention span. The order provided that if Mother did not call Father by 10:00 a.m. on Saturday, Father could assume that Mother did not intend to exercise her Sunday parenting time. Mother was further ordered to treat W.C. appropriately for his age and to refrain from discussing adult topics with him. The trial court also granted a protective order prohibiting Mother from any contact with W.C., Father, or Father's wife outside of the ordered times. A review hearing was set for July 2010.

Father maintained a three-page journal in which he documented Mother's conduct during parenting time and the effects on W.C. between the May modification order

and the July review hearing. Father submitted this journal to the trial court during the review hearing, and the court used the journal to question Mother and Father. The following are the journal entries for the McDonald's visits:

> May 23, 2010—Brought [W.C.] calendar with court dates, [spoke with] him about court, fed him
>
> May 30, 2010—Brought cassette player and would make him record various things like "I love you" and "I miss you[.]" Brought up how he use[d] to cuss and she would make him eat [Ta-]basco sauce. [W.C.] started cussing that night[.] She was laughing [to W.C.] about how he use[d] to cuss ...
>
> June 6, 2010–brought [W.C.] another calendar with court dates. [Spoke with] him about how she missed him and ... about his old school, the last time he visited her—purposely making him upset. Also [spoke with] him about court again and fed him
>
> June 13, 2010—she did not call until almost noon on [S]aturday and left a message we could not understand—visit was denied
>
> June 20, 2010—brought recorder and tried to record [W.C.] again but he would not do it. Played him songs about missing him. Brought preschool books—[S]esame [S]treet & Clifford[.] Referred to him often as a baby, wiped his mouth and fed him. Was whispering things to him. Gave book with up[s]etting things wr[itten] in it.
>
> June 27, 2010—[Spoke with] him about court and that he would come back to stay with her. Whispered alot [sic]. Overheard her tell him this was a bad place and he should be with her. Was very "out of sorts today[.]" She was hard to understand and seemed to be on something

> July 4, 2010—she continued to feed him & refer to court and attorneys often. Referred to what would happen after the 14th often. [W.C.] tried to tell her about new bike and the fair he went to and she told him how dangerous it all was and how he could get hurt and bust his head open. [W.C.] very upset—pooped his pants that day
>
> July 11, 2010—talked to him about how she could die with her illness. Spoke continually about the "14th" and how he should pray that everything goes well in court. fed him milkshake with a spoon[,] fed him candy by hand

Appellant's App. p. 55–56. Regarding Mother's phone calls to W.C., Father's journal states that "each call has been an exten[s]ion of the visits. Speaking to him in baby talk. Most of the calls could not even be understood. VERY slurred speech on every call." *Id.* at 54. Finally, Father's journal lists W.C.'s behavioral issues that he did not exhibit before the visits:

> Pooped in his pants
>
> Started cussing
>
> Reverted back to baby talk
>
> Started yelling
>
> Became obsessed with baby things RE: toys, [TV] shows ([S]esame [S]treet etc) when he had previously been on 10 yr old level such as cars, trucks, video games

*Id.*

At the review hearing, Father confirmed the substance of his journal entries and added a few more details. He claimed that Mother told W.C. that Father's wife was a bad person and that W.C. lived in a bad place. He told the court that he and his wife "talk to [W.C.] about everything and put structure in his life and anything he wants to do we're there for him. You know, we try to encourage him to do

things." Tr. p. 25. As to Mother's Wednesday calls to W.C., Father said he hears the conversations because he turns on the speaker phone. He further told the court that W.C.'s school has taught him to communicate in the form of a story if he becomes upset, and that on the way to McDonald's for the July 11 visit, W.C. told Father and his wife, "I'm going to tell you a story . . . about a little boy that doesn't want to go to McDonald's, I want to stay home." *Id.* at 29; *see also* Appellant's App. p. 54. Father stated, "[Mother]'s not any way, shape, or form, a positive influence in his life at all." Tr. p. 29. He claimed that nothing had changed regarding Mother's treatment of W.C. for a year and a half and implored the court for help.

Most of the trial court's questions asked Mother to explain her actions as documented in Father's journal. Mother claimed the only time she fed W.C. was when she showed him how to get the last bit of his milkshake with a spoon. She acknowledged showing W.C. how to hold his Big Mac but denied ever feeding him his sandwiches or fries. She said W.C. loves calendars so she gave him two from Legal Aid, and she did not think he understood what the highlighted court dates meant. She also said she gave him a puppy calendar the week before the hearing. She stated that W.C. brought up the topic of court by asking her how many more Sundays he would get to see her, and she told him that it was up to other grownups and that they would find out in July.

Mother said that she asked W.C. to make the voice recordings because "I don't hear [his voice] around the house no more" and because "he used to love to do that." *Id.* at 11. Mother admitted that she asked W.C. whether he had been cussing. As to talking about W.C.'s old school, Mother explained that she asked W.C. the date school started, and when he responded, she told him he was lucky because his old school started earlier. Mother claimed that she showed W.C. a picture of when he was younger because she wanted to show him that she had noticed how much he had grown. She explained to him, "This is how you looked last year. This is how you look this year. You're no longer my little nine year old boy that went away last year." *Id.* at 13. Regarding the missed visit, Mother explained that she called late on Saturday about parenting time on Sunday because she was suffering from a cluster of kidney stones and neglected to notice the time. As to Father's journal entry that Mother played W.C. songs about missing him, Mother said that she played W.C. a Kings of Leon song because he used to sing it along with her. Mother admitted bringing W.C. Spider Man and Clifford books but also said she brought him Hot Wheels books and a book about the earth.

When the court asked Mother whether she referred to W.C. as "Baby," Mother responded that she had been calling him "Big Man." She did not remember calling W.C. "Baby" or wiping his mouth. Later, when the court asked her to address Father's claim that she used baby talk during the Wednesday phone calls, Mother admitted that she may inadvertently call W.C. "Baby" sometimes, but that she is trying to treat him like a pre-teen.

Mother stated that she does not talk loudly during the visits since they are at McDonald's and denied saying anything about Father's wife. Instead, she claimed she asked W.C. whether he "still had Baby Jesus in his heart" and told him to "pray for the middle of July where maybe Mommy can get you for the day." *Id.* at 20, 21. When W.C. told Mother that he went to the fair and rode the Scrambler, Mother said she told him that the Scrambler used to be her favorite ride. As to W.C. telling Mother about his new bike, Mother said,

"I was worried he does not know how to ride a bike and I was worried that they wouldn't get him training wheels and a helmet. Because I even told him that next Wednesday 'I got two helmets, if you don't have one you can have one.'" *Id.* at 23–24. When W.C. said something to Mother about her hair growing back, Mother explained that she wore a headband because her hair was clipped after her second aneurism and that she considered herself lucky because eighty percent of people who have aneurisms die.

The trial court ordered Mother's parenting time rights and any other contact with W.C. immediately suspended, stating in relevant part:

> Having reviewed and considered [Father]'s diary filed of record; statements and explanations from [Mother] and [Father] concerning [Mother]'s supervised parenting time and telephonic communication with the child, [W.C.], since May 11, 2010; and, statements of counsel, being duly advised in the premises, the Court now Orders [Mother]'s parenting time rights and all right of any contact with the parties' minor child, [W.C.], be suspended immediately.

Appellant's App. p. 9. The order failed to make the requisite statutory finding of endangerment to W.C.'s physical health and well-being or significant impairment to W.C.'s emotional development. *See* Ind. Code § 31–14–14–1(a). Along with the suspension of Mother's parenting time rights, the court granted a protective order against Mother until July 2020, at which point W.C. would be twenty years old. The court also invited Mother to petition the court to reinstate her parenting time when she was ready:

> Ma'am, at such a point when you feel that you have gained the appropriate skills for a special needs child, gone through counseling and therapy, parenting education, petition the Court to reinstate your parenting time. But you've got a lot of work to do. And I have to let this little kid get settled into a life, into his school, and get his work done because he has special needs. So you go do the work you need to do, he'll do the work he needs to do.... Petition the Court when you're ready again.

Tr. p. 39.

Mother appealed the suspension of her parenting time. After briefing was completed by both parties, this Court issued an order to the trial court directing it to enter a revised final order containing "complete findings of fact and conclusions of law that are fully supported by the evidence and that provide an explanation as to how its factual findings support its order suspending Mother's parenting time." Order, No. 82A04–1008–JP–496 (Ind.Ct.App. Apr. 28, 2011). In our order, we also granted both parties time to file responses to the revised order. The trial court issued a revised order with numerous findings and the following conclusions:

### Endangers the Child's Physical Health and Mental Well–Being—I.C. 31–14–14–1(a)(1)

1. The Court finds that the child's mental well being is endangered when the mother is allowed parenting time with the child. Throughout the hearing that brought this matter in front of the Court plus prior testimony and evidence presented at the trial court level, there is ample evidence that mother engages in a pattern of conduct that causes the child to be upset and anxious.

2. The facts show that the mother, during visitation, would bring calendars showing the next court dates and mother would discuss these dates with the child. Along with telling the child about court dates, the

mother would also indicate to the child that he would be coming home with her soon. Mother also had the child speak into a voice recorder and instructed the child to say "I love you" and "I miss you" so mother could play these back to [sic] at a later time to hear the child's voice.

3. Mother also speak [sic] to the child about past memories of when he lived with her, his former school, how much she missed him, and of past friends. These topics usually resulted in making the child cry.

4. Mother played songs to the child that mentioned missing a loved one.

5. Previously, the Court had instructed the mother that these actions on her part were not permitted due to the fact that the child would become upset. The court at one point gave suggestions as to what would be appropriate topics for a child such as this child. Despite admonishment by the Court to stop these inappropriate behaviors, mother did not follow the Court's directives.[1]

***Significantly Impair the Child's Emotional Development—I.C. 31–14–14–1(a)(2)***

6. Evidence was given to the court that at parenting time the mother would "baby talk" to the child, feed him during parenting time and bring books and toys that were for children many years younger than the child.

7. The child has been diagnosed as having autism spectrum syndrome and being mildly mentally disabled.

8. The Court finds that based on documents submitted to the Court, that not interacting on an age appropriate level with child has resulted in the child's behavior regressing.

9. The Court has repeatedly instructed and alternately admonished the mother as to her behavior towards the child and the negative effect it has upon the child. Due to mother's continued inappropriate conduct with the child the court found that it is necessary to suspend mother's parenting time, thereby protecting the child.

Revised Final Order, No. 82D01–0009–JP–1070 (May 31, 2011). Mother filed a response. Father had ten days from the date of Mother's response to file his response. He did not do so.

## Discussion and Decision

Mother contends that the trial court abused its discretion by suspending her parenting time. Although Father is quick to point out on appeal that "[Mother]'s parenting time was not terminated," Appellee's Br. p. 1, the suspension of Mother's parenting time and the protective order against her effectively terminated her parenting time. *See D.B. v. M.B.V.,* 913 N.E.2d 1271, 1274 (Ind.Ct.App.2009) (father's parenting time effectively terminated where trial court eliminated parenting time and issued no-contact orders), *reh'g denied.*

Decisions involving parenting time rights under the paternity statutes are committed to the sound discretion of the trial court.[2] *Taylor v. Buehler,* 694

---

1. We have not been given any record or transcript of prior proceedings. Our ruling is based solely on the record before us.

2. Although Mother and Father cite the statutes governing parenting time rights of non-custodial parents, *see* Ind.Code ch. 31–17–4, it appears that this action was originally filed as a paternity action, *see* Appellant's App. p. 1 (first page of chronological case summary labeling case as an alleged paternity action). Therefore, the statutes in Indiana Code chap-

N.E.2d 1156, 1159 (Ind.Ct.App.1998), *trans. denied.* Reversal is appropriate only upon a showing of an abuse of that discretion. *Id.* When reviewing the trial court's decision, we neither reweigh the evidence nor reexamine the credibility of the witnesses. *Walker v. Nelson,* 911 N.E.2d 124, 130 (Ind.Ct.App.2009).

Indiana has long recognized that the right of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents. *Lasater v. Lasater,* 809 N.E.2d 380, 400 (Ind.Ct.App.2004). Accordingly, a noncustodial parent in a paternity action is generally entitled to reasonable parenting time rights. *See* Ind.Code § 31–14–14–1(a). The right of parenting time, however, is subordinated to the best interests of the child. *Lasater,* 809 N.E.2d at 401. Indiana Code section 31–14–14–1, which outlines the parenting time rights of a noncustodial parent in a paternity action, provides:

> (a) A noncustodial parent is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time might:
>
> > (1) endanger the child's physical health and well-being; or
> >
> > (2) significantly impair the child's emotional development.

Indiana Code section 31–14–14–2 provides, "The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child."

■ Even though Section 31–14–14–1 uses the term "might," this Court interprets the statute to mean that a court may

not restrict parenting time unless that parenting time *would* endanger the child's physical health or well-being or significantly impair the child's emotional development. *Walker,* 911 N.E.2d at 130. By its plain language, Section 31–14–14–1 requires a court to make a specific finding of physical endangerment or emotional impairment before placing a restriction on the noncustodial parent's parenting time. *Id.* A party who seeks to restrict parenting time rights bears the burden of presenting evidence justifying such a restriction. *Farrell v. Littell,* 790 N.E.2d 612, 616 (Ind. Ct.App.2003). The burden of proof is the preponderance of the evidence standard. *In re Paternity of P.B.,* 932 N.E.2d 712, 720 (Ind.Ct.App.2010).

By May 2010, the trial court had already whittled down Mother's parenting time to one-hour supervised visits at McDonald's on Sundays and telephone contact on Wednesdays with the length of the calls limited to W.C.'s attention span. At the July review hearing, Father sought to terminate Mother's parenting time rights, *see* Tr. p. 31; thus, he bore the burden of presenting evidence justifying such a restriction. He failed to do so.

The evidence presented by Father was his own three-page journal of Mother's conduct during two months of parenting time and his additional comments at the review hearing. We note that the trial court heard no testimony from a guardian ad litem, therapist, or any other professional or objective witness. Based on this evidence, the trial court concluded that Mother's actions endangered W.C.'s physi-

ter 31–14–14, which pertain to parenting time following a determination of paternity, apply to this case. *See, e.g., Taylor v. Buehler,* 694 N.E.2d 1156, 1159 (Ind.Ct.App.1998) ("Because Taylor's visitation rights were established through a *paternity* action, the controlling statute is I.C. 31–6–6.1–12(b) [repealed,

see now Indiana Code sections 31–14–14–1 & –2], found under the paternity chapter of Title 31 . . . ."), *trans. denied.* In any event, the relevant provisions in both chapters are nearly identical. *Compare* Ind.Code § 31–14–14–1(a) *with* Ind.Code § 31–17–4–1(a).

cal health and mental well-being by causing W.C. to be "upset and anxious" and significantly impaired W.C.'s emotional development, which "has resulted in the child's behavior regressing."

We acknowledge that W.C. is an autistic child with special needs. We further acknowledge that Mother needs to improve her parenting skills. The record, however, "does not approach the egregious circumstances in which we have previously found that parenting time may be terminated, such as when a parent sexually molests a child." *D.B.*, 913 N.E.2d at 1275; *cf. Duncan v. Duncan*, 843 N.E.2d 966, 972 (Ind.Ct.App.2006) (denial of parenting time not abuse of discretion where evidence showed father had sexually molested one of his children, threatened her with loaded gun, showed no remorse, and refused counseling sessions), *trans. denied.* Importantly, Father's evidence still shows that Mother loves W.C., wants to be a part of his life, and brings him gifts.

This case throws into sharp relief the challenge of protecting a child's emotional development and physical health and well-being while also recognizing a parent's "precious privilege" of exercising parenting time with that child. We do not minimize the behavioral issues W.C. has exhibited following Mother's parenting time. However, Father simply did not present evidence justifying termination of what little parenting time Mother had left.

We therefore reverse the trial court's modification order. Reinstatement of Mother's parenting time necessarily requires the trial court to vacate the ten-year protective order. Further, although the termination of Mother's parenting time is not supported by the evidence, the record would support an order for the parenting time to be supervised by a third party and for Mother to attend parenting classes, therapy, or counseling. In these ways, Mother would be able to receive guidance in how to appropriately deal with W.C.'s special needs. On remand, we encourage the trial court to consider such orders.

Reversed and remanded.

KIRSCH, J., and MATHIAS, J., concur.