## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 16 2019, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT, PRO SE

Darya Hupp
Fort Wayne, Indiana

ATTORNEYS FOR
APPELLEE-INTERVENOR

George Guido
David C. Pricer
Graly & Guido Law Office, LLC
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Paternity of R.H.

Darya L. Hupp,

*Appellant-Petitioner,*

v.

Adam Salsburey,

*Appellee-Respondent,*

and

Carolyn Clay,

*Appellee-Intervenor*

April 16, 2019

Court of Appeals Case No.
18A-JP-2110

Appeal from the
Adams Circuit Court

The Honorable
Chad E. Kukelhan, Judge

Trial Court Cause No.
01C01-0609-JP-67

**Vaidik, Chief Judge.**

# Case Summary

[1] Darya L. Hupp ("Mother") appeals the trial court's order suspending her parenting time and finding her in contempt for failing to pay child support as ordered and to correct her son's birth certificate. We affirm.

# Facts and Procedural History

[2] Mother and Adam Salsburey ("Father") have one child, R.H. ("Child"), who was born in 2005. Father's paternity of Child was established by order of the Allen Circuit Court in 2007. At that time, the court also ordered Mother to correct Child's birth certificate to list Father as the father of Child. Because Child was born in California, the court found that correcting Child's birth certificate was Mother's responsibility.

[3] Two years later, in 2009, Mother informed the court that she desired Child's paternal grandmother, Carolyn Clay ("Grandmother"), to serve as Child's custodian. After a hearing on Mother's request, the court ordered custody of Child be granted to Father. Mother was granted visitation with Child pursuant to the Indiana Parenting Time Guidelines "or as the parties may agree." Appellant's App. Vol. II p. 55. Shortly after the court issued its order ("2009 Order"), Mother relocated to California. Then, in 2015, Father executed a medical and educational power of attorney of Child in favor of Grandmother and her husband, Daniel Clay, and moved out of state. Father has not returned to Indiana and has had virtually no contact with Child since 2015.

In December 2016, Mother filed a petition to modify custody. Grandmother was permitted to intervene in the case and requested that Mother's parenting time be "restricted and/or limited to that of supervised." *Id*. at 52. In January 2017, Father signed an affidavit "for the purpose of showing his complete, full, and voluntary consent to primary sole physical custody being awarded to [Grandmother]." *Id*. at 35. After Mother requested and was granted two continuances, a hearing was held on April 24. Mother failed to appear and sent the court a letter explaining that "[t]he emotional traumatic nature of this case renders me incapable of completing the Interrogatories and any future inquires or motions that may arise . . . I will be unable to complete the forms that have been requested of me, and I will be unable to attend the hearing set for April 24." Appellee's App. Vol. II p. 12. After the hearing, the court issued an order granting sole legal and physical custody of Child to Grandmother. The order provides, in relevant part:

> 3. Shortly after the entry of the [2009 Order], [Mother] moved to California and has resided there since that time. Since that point in time, she has only had physical contact with [Child] on one (1) brief occasion and has chosen to have only nominal phone or other electronic contact with him. For that matter, [Mother] has had no contact of any kind with [Child], whether in person, email, skype, or phone contact since March 31, 2012.

> *****

> 9. [Child's] Nurse Practitioner, Candace Lemke, of The Bowen Center in Fort Wayne, Indiana, has advised that it would be in

[Child's] "best interests to remain with [Grandmother] since he has been there since age 3."

10.  [Child] currently has a learning disability and suffers from ADHD.

\*\*\*\*\*

13.  After two (2) continuances having been requested by, and granted to [Mother], this matter was set for a final hearing before this court on [April 24].  When granting the second continuance, [Mother] was advised that the court was "granting this LAST continuance over the objection of counsel and resets the matter to [April 24] on which day and time this matter will DEFINITELY be heard."

14.  [Mother] sent a letter to the court acknowledging her "inability" to complete Interrogatories propounded to her as well as "any future inquires or motions that might arise," as well as her inability to attend the hearing set for [April 24].

15.  Having heard sworn testimony, the court orders:

\*\*\*\*\*

d.  For the reasons presented to this court, this court finds that parenting time between [Mother] and [Child], would significantly impair [Child's] emotional development and well being and, further, might endanger [Child]. Accordingly, parenting time between [Mother] and [Child] whether in person or by phone, shall be on an agreed upon basis, with the understanding that [Mother's] parenting time shall be restricted.  Given that [Mother] has had no physical contact with [Child] since August of 2009, and no

contact of any kind, electronic or otherwise, since March 31, 2012, [Mother's] parenting time shall take place in Fort Wayne, Indiana and shall be supervised, at all times, by [Grandmother] and/or her husband, Daniel Clay, whether in person or by phone.

e. [Mother] is, once again, admonished to complete the necessary paperwork required to have [Child's] birth certificate changed to reflect that [Father] is the father of [Child].

*****

g. [Mother] shall be obligated to pay child support for [Child] on a nominal basis. [Mother's] obligation shall be at the rate of $51 per week.

*****

j. [Grandmother] has incurred attorney fees of approximately $7,436 with regard to her need to defend, and respond to [Mother's court petitions]. . . . The court finds that [Mother], who initiated these proceedings in the first place, should be obligated to pay one-half (1/2) of those attorney fees, or the sum of $3,718.

Appellant's App. Vol. II pp. 56-59. Over six months later, in December 2017, Mother notified the court that she had permanently relocated back to Indiana on July 6, 2017, that she had been unemployed since 2015, that she had left her job "because of religious discrimination," that she was without income, and that she was homeless, living in a shelter. *Id.* at 61.

[5]     In June 2018, Mother filed a petition to modify parenting time. Grandmother responded by filing an information for contempt and rule to show cause, a petition for attorney's fees, and a motion for proceedings supplemental. A hearing on these motions was held in August 2018. At the hearing, Mother admitted that she had not corrected Child's birth certificate, testifying that "according to the California Department of Health, I have to have a notarized statement from [Father] that he is [Child's] biological father." Tr. p. 6. Mother said that she sent Father a letter on July 20 asking for a notarized statement, but that she had not heard back from him. Regarding child support, Mother testified that she was "not in arrears of any child support." *Id.* However, Grandmother provided evidence showing that Mother "was willfully behind for a very long time," was "very sporadic" in child-support payments, and that she made a "substantial payment to get the support caught up" "in anticipation of the hearing." *Id.* at 21; *see also* Ex. I-1. Grandmother also presented evidence that Mother had secured two jobs, one at The Lamp Light and the other at Generation Home Care and was able to pay her weekly child-support obligation. Finally, Mother testified that "the reason why" she is seeking to modify parenting time "is because this is a case of parental alienation." Tr. p. 11. Mother said that after Child "hung up on [her] on his birthday, [she] sent him a Hallmark card and [she] told [Child], [']you know, sweetie, I can't talk to you or visit you just yet until after court, after we get this whole thing situated because it's just too toxic.[']" *Id.* at 12. Mother testified that her relationship with Child has "been poisoned" and that she believed Child thinks she "just abandoned him and never wanted anything to do with him." *Id.* Mother

asserted that having unsupervised parenting time with Child would "save [her] relationship with [Child]." *Id*. at 11. Mother stated that she blamed Grandmother for "allowing [Child] to hang up on [her] on his birthday," and she introduced evidence showing that she called Grandmother "many, many times" between May 27 and June 10. *Id*. at 8.

[6] Grandmother also introduced evidence that Mother called her "many, many times" between May 27 and June 10. Grandmother's evidence showed that on June 3, after Mother had called her numerous times without leaving a phone number, Mother finally left a message with a return phone number. Grandmother then called Mother to facilitate a supervised phone visit with Child. During the conversation, Mother told Child "your grandmother is a liar. Everything she has told you about me is a lie. She stole you from me." *Id*. at 23. Child became upset and asked Mother to "not speak that way about someone that he loved," but Mother ignored him and continued calling Grandmother a liar. *Id*. When Child began crying, Grandmother ended the phone visit.

[7] Grandmother then presented evidence that on June 8, she called Mother to set up a time for Mother to have an in-person visit with Child. *See* Ex. I-4, I-5. After some argument, Mother finally agreed to meet for a visit at the Glenbrook Mall on June 16. *See id*. However, before the visit occurred, Mother called Grandmother thirty times "in an hour" on June 10, Child's birthday. Tr. p. 26. It was during one of these thirty phone calls that Child told Mother "I don't want to talk to you" and hung up on her. *Id*. at 8. Grandmother then presented

evidence of a police report from June 10, showing that she contacted police because of Mother's "incessant, non-stop calls." *Id.* at 25; Ex. I-6. The report showed that when officers spoke with Mother, she admitted that she had called thirty times within the last hour, "that she will be done for the day, but, will start back up tomorrow and then the next day and will continue to call to speak with [Child] every day until she gets to have a conversation with [Child]." Ex. I-6. The report also stated that Mother informed officers that she intended on having Grandmother arrested because "she can call [Child] whenever she wants" and "can talk to [Child] right on the spot." Tr. p. 26. Despite all of this, Grandmother provided evidence that she took Child to the Glenbrook Mall on June 16 and then waited an hour for Mother. Mother "never show[ed] up," and when Grandmother and Child got home, a card from Mother had been delivered. *Id.* In the card, Mother wrote that she would not be visiting Child that day because she "can't have what little [they] have left to be ruined." Ex. I-7.

[8] Grandmother's evidence showed that since "she began caring for [Child] at age three and a half," he "has flourished and thrived in" her home. Tr. p. 19. Grandmother also introduced evidence showing that Mother's "most recent behavior since the [hearing on April 24, 2017] has been rather erratic." *Id.* at 17. First, Grandmother introduced a police report showing that on July 17, 2017, Mother approached a woman's home, asked the woman to pray with her, and after the woman refused, began cussing at the woman. The woman called the police, and Mother told the responding officers that "Jesus spoke to her and

told her to go and spread His word and pray with people." *Id*. at 22. Next, Grandmother introduced a second police report showing that on September 17, 2017, Mother went to a church in Fort Wayne with a shaved head and began to preach to the church. The church asked Mother to leave and called the police. When officers spoke to Mother, she told them "she was only doing what God had told her to do." *Id*. Grandmother then introduced a third police report showing that on February 4, 2018, police officers were called to another church when Mother "went off on a tangent while giving testimony to the congregation." *Id*. This report stated that Mother had a history of causing problems at churches and "has been trespassed from other churches because of this." *Id*. Finally, Grandmother introduced a fourth police report showing that on April 8, 2018, police officers were called to a church because Mother was "screaming and yelling inside the sanctuary." *Id*. Furthermore, Grandmother also introduced a YouTube video that showed Mother shaving her hair then taking the hair and burning it, while professing "I'm [d]oing this to prove that I'm not crazy." *Id*. at 27; *see also* Ex. I-10. Based on this evidence, Grandmother requested, in addition to denying Mother's petition to modify parenting time, that the court order Mother to "complete some sort of psychological evaluation by a counselor or a psychologist" before exercising any parenting time. Tr. p. 23.

[9] Following the hearing, the court issued an order denying Mother's petition to modify parenting time and granting Grandmother's information for contempt and rule to show cause and petition for attorney fees. The court also granted

Grandmother's request that Mother undergo psychological evaluation and counseling before any more parenting time occurs. The order provides, in relevant part:

> 3. [Mother] is found in contempt of this Court's orders as to her prior non-payment of child support and failure to secure the corrected birth certificate for [Child].
>
> 4. [Grandmother] has incurred attorney fees in having to defend against [Mother's] *Petition to Modify Parenting Time* . . . as well as her prosecution of her *Verified Information for Contempt and Rule to Show Cause* in the amount of $4,190.50.
>
> 5. [Mother] is ordered to pay the sum of $4,190.50 to [Grandmother's] attorney, Brian E. Stier, within 90 days of the date of this order.
>
> 6. Based upon the evidence presented at the hearing, [Mother] is ordered to undergo a complete psychological evaluation with David Lombard, Psychologist . . . or James Cates, Psychologist . . . before any further supervised telephonic or in person parenting time is to occur. [Mother] shall be responsible for the cost and expense of the psychological evaluation.
>
> 7. Further, [Mother] shall, at her expense, enroll and participate in individual counseling with a board certified psychologist or licensed therapist. . . . [Mother] shall attend said counseling at a minimum of one time per week until further Order of this Court. . . . [Mother's] participation in counseling is a requirement for any further supervised telephonic and in person parenting time.

Appellant's App. Vol. II pp. 26-27.

Mother, pro se, now appeals.

# Discussion and Decision

Mother raises two arguments on appeal. She contends that the trial court erred by suspending her parenting time and by finding her in contempt for failing to pay child support as ordered and to correct Child's birth certificate.

# I. Suspension of Parenting Time

Mother first argues that the trial court abused its discretion when it effectively suspended her parenting time by ordering her to undergo a psychological evaluation and participate in individual counseling before any additional parenting time can occur. Decisions involving parenting-time rights under the paternity statutes are committed to the sound discretion of the trial court.[1] *In re Paternity of W.C.*, 952 N.E.2d 810, 815 (Ind. Ct. App. 2011). Reversal is appropriate only upon a showing of an abuse of discretion. *Id*. at 816. When reviewing the trial court's decision, we do not reweigh the evidence or reexamine the credibility of the witnesses. *Id*. Indiana has long recognized that the right of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents. *Id*. Accordingly, a noncustodial parent in a

---

[1] Even though Mother and Grandmother cite the statutes governing parenting-time rights of noncustodial parents in divorce cases, *see* Indiana Code ch. 31-17-4, this is a paternity action, *see* Appellant's App. p. 2 (first page of CCS labeling case as "In re: The Paternity of [Child]"). Therefore, the statutes in Indiana Code chapter 31-14-14 apply to this case. In any event, the controlling provisions in both chapters are nearly identical. *Compare* Ind. Code § 31-17-4-1(a) *with* Ind. Code § 31-14-14-1(a).

paternity action is generally entitled to reasonable parenting-time rights. *See* Ind. Code § 31-14-14-1(a). The right of parenting time, however, is subordinated to the best interests of the child. *Id*. Indiana Code section 31-14-14-1, which outlines the parenting time rights of a noncustodial parent in a paternity action, provides:

> (a) A noncustodial parent is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time might:
>
> > (1) endanger the child's physical health and well-being; or
>
> > (2) significantly impair the child's emotional development.

[13] Indiana Code section 31-14-14-2 provides that "[t]he court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child." A party who seeks to restrict parenting-time rights bears the burden of presenting evidence justifying such a restriction. *In re Paternity of W.C.*, 952 N.E.2d at 816. The burden of proof is the preponderance-of-the-evidence standard. *Id*.

[14] In April 2017, the court found that parenting time between Mother and Child would significantly impair Child's emotional development and well-being and, further, might endanger Child. *See* Appellant's App. Vol. II p. 58. By the hearing in August 2018, Mother presented no evidence that that had changed. Here, Child, who has a learning disability and suffers from ADHD, has been cared for by Grandmother since he was three-and-a-half years old. Mother, on

the other hand, has only seen Child once, for one hour, in the past nine years. The evidence also shows that when Grandmother tries to facilitate parenting time, Mother becomes argumentative and abrasive, telling Child that Grandmother is a "liar" and alleging that Grandmother "stole you from me." Tr. p. 24. Furthermore, Mother's thirty calls over a single hour are evidence of her belief that she can call and speak to Child whenever she wants, despite the court's order that parenting time "shall be on an agreed upon basis." Appellant's App. Vol. II p. 58. And when Mother did agree to meet Grandmother to exercise in-person parenting time, Mother did not show up and, instead, mailed Child a card writing that she cannot talk to Child or visit Child until after court. Finally, Mother's actions evidenced by the four police reports and YouTube video depict erratic behavior. To the extent that Mother alleges that the court suspended her parenting time "because of her religious beliefs," we see no evidence of that. Nonetheless, even without considering any evidence involving Mother's religious activities, there is ample evidence to support the court's decision. Moreover, to the extent that Mother asserts that Grandmother is trying to "alienate" Child from her, that does not seem to be the case. Instead, the evidence shows that Grandmother worked with Mother to schedule visits and took Child to the mall so that Mother could visit Child in person, despite Mother's nonstop calls just days before. Accordingly, we find no abuse of discretion in the trial court's decision to suspend Mother's parenting time until she completes a psychological evaluation and enrolls in individual counseling.

# II. Contempt

[15]    Mother next contends that the court erred by finding her in contempt for failing to pay child support as ordered and to correct Child's birth certificate. Whether a party is in contempt of court is a matter within the trial court's discretion, and we will reverse only if the trial court's finding is against the logic of the evidence before it or is contrary to law. *Mosser v. Mosser*, 729 N.E.2d 197, 199 (Ind. Ct. App. 2000). To hold a party in contempt for a violation of a court order, the trial court must find that the party acted with willful disobedience. *Piercey v. Piercey*, 727 N.E.2d 26, 32 (Ind. Ct. App. 2000).

[16]    Mother challenges the court's finding of contempt regarding child support by stating that "[n]ot only has [she] been paying child support, she was found to be in no arrears." Appellant's Br. p. 17. The purpose of establishing a regular schedule of support payments is one of "providing regular, uninterrupted income for the benefit of that parent's children, who are in the custody of another," and in this regard, "[t]he regularity and continuity of court decreed support payments are as important as the overall dollar amount of those payments." *In re Marriage of Bradach*, 422 N.E.2d 342, 353 (Ind. Ct. App. 1981) (citing *Haycraft v. Haycraft*, 375 N.E.2d 252, 255 (Ind. Ct. App. 1978)). A noncustodial parent is required to make payments in the manner, amount, and

at the time required by the support order, at least until such order is modified or set aside. *Haycraft*, 375 N.E.2d at 255.[2]

[17] Here, Mother was ordered to pay $51 per week in child support. The evidence shows that Mother made "very, very sporadic payment[s] of support" and that Mother "made a substantial payment to get the [child] support caught up." Tr. p. 21. On appeal, Mother does not dispute that she was very sporadic in her child-support payments or that she made a large one-time payment just before the hearing. Mother also does not provide any reason why she cannot pay her weekly child-support obligation of $51 per week with the income she earns from two jobs. As such, we find that the court did not abuse its discretion in finding Mother in contempt for failing to pay child support as ordered.

[18] Finally, Mother argues that the court abused its discretion by finding her in contempt for failing to correct Child's birth certificate. Specifically, Mother contends that she "provided proof of a good faith effort to amend" Child's birth certificate. Appellant's Br. p. 17. She did not. In 2007, Mother was ordered to correct Child's birth certificate to show that Father was Child's father. Since then, Mother obtained what looks like a "Frequently Asked Questions"

---

[2] Mother also argues that the court erred by ordering her to pay attorney's fees to Grandmother's attorney. Mother does not present a cogent argument on this issue. *See* Ind. Appellate Rule 46(A)(8)(a). Nonetheless, we affirm the trial court's holding that Mother was in contempt. Once a party is found in contempt, the trial court has inherent authority to award attorney's fees as compensation for damages resulting from the other party's contemptuous actions. *Topoliski v. Topoliski*, 742 N.E.2d 991, 996 (Ind. Ct. App. 2001), *reh'g denied*. Such authority includes the award of attorney's fees by a party to enforce a child-support order. *Id*. Because Mother was found in contempt, the court did not err by awarding attorney's fees to Grandmother.

document from the California Department of Health regarding acknowledgement of paternity in January 2018 and sent Father a letter requesting that he sign a notarized statement of paternity in July 2018. *See* Appellant's App. Vol. II pp. 68-79. At the hearing, Mother did not provide any evidence that she had contacted the California Department of Health and provided them with the order establishing Father's paternity or that the California Department of Health had previously denied a request to correct Child's birth certificate. We find that Mother has not made a "good faith effort" to amend Child's birth certificate and as such, the court did not abuse its discretion by finding her in contempt for failing to correct Child's birth certificate.

[19] Affirmed.

Kirsch, J., and Altice, J., concur.