

IN THE

# Court of Appeals of Indiana

Kasey Parsons,

*Appellant-Petitioner*

v.

Ryan Brock,

*Appellee-Respondent*

March 27, 2026

Court of Appeals Case No.
25A-JP-2771

Appeal from the Morgan Circuit Court

The Honorable Matthew G. Hanson, Judge

Trial Court Cause No.
55C01-2110-JP-335

**Opinion by Judge DeBoer**
Judges Brown and Altice concur.

**DeBoer, Judge.**

## Case Summary

[1] Early in these paternity proceedings, the trial court prohibited Ryan Brock (Father) from exercising parenting time with his children, finding he was "a clear and present danger to both the children" and their mother, Kasey Parsons (Mother). Appellant's Appendix Vol. 2 at 27. Over three years later and after Father was incarcerated for a period of time, Father filed a motion to re-establish parenting time. At the hearing on that motion, it came to light that Mother had reconciled with Father and allowed him to live with her and the children for a while despite the court's order prohibiting him from seeing them. Finding Mother had not used "the tools [the court provided her] to ensure her children were safe," the court reinstated Father's parenting time. *Id.* at 50. Mother appeals, arguing the court failed to base its decision on "evidence that [Father] no longer presents any threat to the children." Appellant's Brief at 12. Because the court failed to base its modification of parenting time on the children's best interests, we reverse and remand.

## Facts and Procedural History

[2] Mother and Father, who never married, are the parents of J.B. (born October 10, 2009) and R.B. (born August 28, 2012). In October 2021, Mother and Father entered into an agreement whereby Mother had primary physical custody but shared joint legal custody with Father. The agreement further provided Father would exercise parenting time in accordance with the Indiana

Parenting Time Guidelines (IPTG) and have no child support obligation. The trial court approved that agreement, but the parties adhered to it for only a few months.

[3] In March 2022, Mother filed a petition to restrict Father's parenting time, alleging he "pose[d] a credible threat to the health and safety of the children." Appellant's App. Vol. 2 at 23. Following an emergency modification hearing at which both parties appeared and presented evidence, the court entered an order concluding Father was "a clear and present danger to both the children and" Mother. *Id.* at 27. Specifically, in the court's March 16 order, it made the following relevant findings:

> 7) That the mother presented substantial evidence of an ongoing and current threat from the father.
>
> 8) That the mother presented pages of phone calls made to her phone from the father where he constantly hangs up.
>
> 9) These persistent calls, all throughout the days, are annoying and harassing and evidence was clear of twenty-six [] phone calls in [one] hour on one day recently.
>
> 10) As well the mother presented voluminous text messages and emails that covered the following topics:
>
>> 1) Threats made to mother's current boyfriend;
>>
>> 2) That mother is a "piece of shit mom"
>>
>> 3) Threats father makes that he is going to kill himself immediately;

4) Requests for the mother to get "back" with him because he loves her;

5) Pictures of mother's workplace and following texts demanding to know where she is at and what she is doing;

6) Threats of going to "court and DCS" immediately to get custody of the children;

7) Demeaning and trolling threats to the mother about her weight, pictures of cows and calling her a tramp and a whore.

11) Next, the father indicates time and again in his communications with mother that he will be killing himself, that he is "ending it tomorrow night" and that he has made sure the oldest son will blame her forever for his death.

12) Likewise, one damning incident occurred where the oldest child called the mother, she called her son and he basically held up the phone while the father claimed he was going to end it all, went out into the woods and shot off a gun to make mother believe he had killed himself.

13) As if these incidents and occurrences were not enough there was more than enough evidence to prove that the father speaks openly with the oldest child about his disdain/hate for mother and that father is nurturing the oldest child to hate the mother and cause problems for her.

14) That the least damning emails indicate the father has told the oldest child to "not be nice to your boy friend" and essentially make life difficult for the mother and her boyfriend if he tries to even speak with the child.

15) That the majority of other emails tell mom she is fat and lazy, that father is going to kill himself and further that mother needs to get back with the father.

16) That father was recorded telling his oldest child, who was in his presence, that he wants the child to "treat the bitch of a mom she is and save the number of CPS on his phone".

17) That father goes further to make the child repeat that he basically hates his mother, that he will essentially sabotage her life if he is forced to live with her and that he hates her.

18) The father repeats these words over and over in one conversation where he also indicates clearly that he has explained to the oldest child that the mother is to blame for his eventual suicide.

19) There are so many recorded messages regarding vile and hostile things the father is saying not only to the mother but also in the presence and around the child that it is clear beyond all doubt that father is psychologically abusing the child as well as the mother.

20) That in over twenty years this court has never seen such obvious and open hatred and anger directed at another party and this court has never seen such obvious attempts to turn a child against a parent.

21) That while this court often hears claims of parent alienation, this is by far the most damning and continuous evidence of alienation ever presented.

22) That the father is also recorded terrorizing his youngest child by following the mother on the highway and driving erratically.

> 23) That child expressed open and obvious fears of the father on the recordings.

*Id.* at 25-27 [sic throughout].

[4] The court also noted Father had been served with an ex parte protective order in open court and it intended to "put in place a full protective order for both the mother and children." *Id.* at 27. Given the nature of its findings, the court prohibited Father from visiting or contacting the children until various conditions were met:

> 48) The mother shall immediately place both children into individual counseling and when recommended by the counselor then family counseling with the father, mother and children can begin.
>
> . . . .
>
> 50) Until the individual counselor for both children recommends to restart contact or visits[,] they simply will not occur.
>
>> 1) The children's counselor may recommend stepping stones for contact and visits, including supervised visits by a third party, and the court will leave that progress for contact/visits, up to the counselor.
>>
>> 2) If in person visits begin again, after the counselor makes such a recommendation, all exchanges of the children shall take place at the Morgan County Sheriff's Department.

*Id.* at 29.

[5]     In July 2022, pursuant to Mother's request for child support, the trial court set Father's support obligation at $269 per week. But in September, Father filed a pro se motion to stop child support because he and Mother were living together with the children. The court notified the parties that to stop child support it would require a signed agreement. No such agreement was ever filed.

[6]     In June 2024, the State intervened to enforce Father's support obligation. On August 13, the State filed a motion for Father to appear and show cause as to why he should not be held in contempt for failing to pay child support. The next day, Father filed a pro se motion stating he "want[ed] to get parenting time set for my kids & talk bout child support." *Id.* at 44 [sic throughout]. On October 21, the trial court held a hearing at which the parties appeared pro se.

[7]     At the hearing, Father claimed he and Mother had gotten back together for three years after the trial court issued its March 2022 order. Mother disagreed, asserting Father had been "in and out" of her house for a while but "wasn't helping to support the children." Transcript at 7. Regardless of how frequently or for how long Father had been back in the home, the parties' reconciliation ended in March 2024 when Father "punched a porch light" during an argument with Mother and was charged with intimidation.[1] *Id.* at 15. Within a few

---

[1] We take judicial notice of the fact that Father was charged with Level 6 felony intimidation and Class B misdemeanor criminal mischief on March 4, 2024, under Cause No. 55D01-2403-F6-312. *See* Ind. Evidence Rule 201(b)(5) ("A court may judicially notice . . . records of a court of this state"). He pled guilty to intimidation in October 2024. Using our Odyssey case management system, we accessed the records of that case as well as other cases and records which were not included in the record on appeal but which we discuss in this decision.

months of that incident, Father was charged in two invasion of privacy cases, and he was later convicted of Level 6 felony invasion of privacy in each case.[2] Regarding those convictions, Father informed the court he had completed the executed portion of his sentences, he was nearly done with one term of probation, and he would spend multiple months on home detention beginning January 16, 2026, before serving another six months of probation.

[8] Mother told the trial court that the children were participating in counseling at their school, but she acknowledged she had not followed the court's order to keep Father away from the children. The court repeatedly asked Mother if its March 2022 order had given her "the tools for how to take care of the problem." *Id.* at 19. Mother agreed it had but said there were "problems that happened afterwards [and] it was hard. It was a lot." *Id.* at 20. At one point, Mother alleged Father had "threatened to kill" her when she tried to follow the court's order. *Id.* at 19. The court, however, commented that Mother was an adult who had the ability "to read . . . and follow [its] order" but had "chose[n] for whatever reason" to do "the exact opposite" of what it required. *Id.* at 20.

[9] At the hearing, Mother asked the trial court to adhere to its March 2022 order and allow input from the children's counselor before reinstating Father's visitation. She said the children were "doing great" after a year and a half of no contact with Father and were participating in school and sports to an extent

---

[2] We judicially notice Father's invasion of privacy cases—Cause Nos. 74C01-2405-F6-246 and 55D01-2406 F6-841.

they previously hadn't been able when Father was around.  *Id.* at 21.  She explained the children were fearful of Father, and she believed restarting visitation "would be detrimental to their healing."  *Id.*  Father, in contrast, requested parenting time in accordance with the IPTG.  When he started to explain he would not hurt his children, the court interjected and stated, "I'm not worried about all that sir.  I'm simply asking what you wanted.  . . . [O]bviously you're asking that we not follow the previous order because it wasn't followed."  *Id.* at 22.

[10]  The next day, the trial court entered an order with findings of fact and conclusions of law.  The court found, in relevant part:

> 18) That on March 16, 2022 the court set out an extremely detailed order for counseling and services for the children and for the father to stay away from the children until counseling recommended connections.

> 19) That the mother hired counsel, spent a substantial amount of time talking of the dangers of father and made the court believe he was a serious danger.

> 20) That it is not often that such particular orders are made unless there is a clear and present danger, as the mother proved such at that time.

> 21) That based upon the testimony of both parties it was a matter of weeks before this danger apparently disappeared as the mother and father got back together and the father was living with/seeing the children.

22) That this is proven not only by the testimony of both parties but by the letter father sent to court about stopping child support.

23) That when the parties apparently split about a year and a half ago she took no steps to come to court to protect the children just as she had no intention of protecting her children at the time just after the order in 2022 was created.

24) That mother claims she was "threatened" by the father to get back together but she is an adult, over the age of eighteen, clearly understood how to come to court to get protection/help, and her allegations simply fall on deaf ears at this time.

25) That if in fact father was such a danger, it is completely impossible to believe that she even attempted to follow the courts detailed order to protect the children or asked for a court hearing to address the failures of the 2022 order or even to address the current situation in the past year and a half.

26) In other words, the court finds that the mother spent an inordinate amount of time, her own money to hire a good attorney and the courts time to convince all that a danger existed when clearly she did not believe it did by her actions.

27) That the court cannot in good conscious allow mother to run to court and cry "wolf" again and again when her actions tell the exact opposite.

28) That the court will not permit mother to utilize the prior order or her cries of danger now when she clearly has/had tools and ignored them.

29) That mother insisted the children are finally doing "well" and did not want to disrupt that, however this falls on deaf ears as

mother had the tools to ensure her children were safe, if there were really a danger, and simply ignored the court order in 2022.

Appellant's App. Vol. 2 at 49-50 [sic throughout].

[11] Based on these findings, the court granted Father one four-hour visit with the children every Saturday in November 2025. The visits were to be held in public places and supervised by Mother's fiancé. Starting in December 2025, Father was to receive parenting time in accordance with the IPTG, including overnights, with exchanges to take place in the Morgan County Sheriff's Department lobby.[3] Mother appeals.

## Discussion and Decision

[12] As an initial matter, we note Father did not file an appellee's brief. We do not develop arguments for the appellee under such circumstances, and we will reverse the trial court's judgment if the appellant's arguments demonstrate prima facie error occurred. *Coronado v. Coronado,* 243 N.E.3d 1121, 1124 (Ind. Ct. App. 2024). "Prima facie error means 'at first sight, on first appearance, or on the face of it.'" *Id.* (quoting *Jenkins v. Jenkins*, 17 N.E.3d 350, 352 (Ind. Ct. App. 2014)).

---

[3] The trial court also calculated that Father owed a child support arrearage in the amount of $48,625 and ordered him to pay $200 per week, $177 of which was for child support and $23 of which went towards his arrearage.

[13]     This appeal concerns the trial court's decision to modify parenting time. "[I]n all parenting time controversies, courts are required to give foremost consideration to the best interests of the child." *In re Paternity of C.H.*, 936 N.E.2d 1270, 1273 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*. We review a court's determination of a parenting time issue for an abuse of discretion, which occurs if its "decision is clearly against the logic and effect of the facts and circumstances before it." *Id.*[4]

[14]     Mother argues "[t]he trial court erred by removing Father's parenting time restrictions based on his and Mother's alleged reconciliation, rather than based on evidence that he no longer present[ed] any threat to the children." Appellant's Br. at 12. "Indiana has long recognized that the right of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents." *Neal v. Neal*, 268 N.E.3d 757, 762 (Ind. Ct. App. 2025) (quoting *Duncan v. Duncan*, 843 N.E.2d 966, 969 (Ind. Ct. App. 2006), *trans. denied*). In that vein, Indiana Code section 31-14-14-1 provides: "(a) A noncustodial parent is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time might: (1) endanger the child's physical health and well-being; or (2) significantly impair the child's emotional development."

---

[4] To the extent our review requires an evaluation of the findings and conclusions the court entered sua sponte, we will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011) (quoting Ind. Trial Rule 52(A)).

[15] Though the trial court's March 2022 order did not explicitly reference section 31-14-14-1, we are confident the statute was the basis for the initial restrictions on Father's parenting time rights. *See* Appellant's App. Vol. 2 at 27 ("[F]ather is a clear and present danger to both the children and the mother in this case."). While the statute uses the word "might," it has been interpreted "to mean that a court may not restrict parenting time unless that parenting time 'would' endanger the child's physical health or emotional development." *S.M. v. A.A.*, 136 N.E.3d 227, 230 (Ind. Ct. App. 2019).[5] The parent seeking to restrict the other's parenting time rights has the burden to prove such restriction is justified by a preponderance of the evidence. *In re Paternity of W.C.*, 952 N.E.2d 810, 816 (Ind. Ct. App. 2011). As the court did here in March 2022, the statute "requires a court to make a specific finding of physical endangerment or emotional impairment before placing a restriction on the noncustodial parent's parenting time." *Id.*

[16] Once a parenting time order is in place, the court may modify it "whenever modification would serve the best interests of the child." Ind. Code § 31-14-14-2. When a parent seeks to modify an order restricting his parenting time, he bears the burden to prove the existing arrangement should be altered. *In re*

---

[5] We recognize that some of the case law we rely upon involves Indiana Code section 31-17-4-2, which is a parallel statute permitting restriction of parenting time rights in the context of dissolution proceedings. Many of "the statutes relating to paternity and dissolution are substantially similar . . . ." *In re Paternity of K.J.L.*, 725 N.E.2d 155, 157 (Ind. Ct. App. 2000) (noting "the underlying principle behind" both sets of statutes is "the best interest[s] of the child"). Thus, "a case involving child custody . . . that arises in the dissolution context may be instructive and authoritative in a case that arises in the paternity context, and vice-versa . . . ." *Id.*

*Paternity of Snyder*, 26 N.E.3d 996, 998 n.1 (Ind. Ct. App. 2015) (applying the standard of review for parenting time modifications because the father's petition to remove restrictions on his parenting time functioned as a request to modify the earlier order).

[17] Here, the trial court's March 2022 order detailed Father's abusive conduct and established he was a "clear and present danger" to the children. Appellant's App. Vol. 2 at 26. This finding was based on documentation and recordings evidencing Father's disturbing behavior. In its October 2025 order, the court confirmed Mother had "proved" endangerment at the March 2022 hearing. *Id.* at 49. Yet, at the subsequent modification hearing, Father presented no affirmative evidence that removing the restrictions on his parenting time would be in the children's best interests. In fact, when he started to claim he would not hurt his children, the court told him it was "not worried about all that sir." Tr. at 22.

[18] Although it is clear the trial court was frustrated by Mother's failure to heed its March 2022 order, in this situation, it was incumbent upon the court to make the children the focus, not Mother. However, the trial court based its decision to reinstate Father's parenting time exclusively on the fact that Mother had gotten back together with him and allowed him to live with the children shortly after the March 2022 order. To the court, this signaled Mother "had no intention of protecting her children" and "did not believe" Father truly endangered them. Appellant's App. Vol. 2 at 49, 50. The court found Mother's renewed attempt to keep Father away "f[ell] on deaf ears as [M]other had the

tools to ensure her children were safe, if they were really [in] danger, and simply ignored the court order in 2022." *Id.* at 50.

[19] We agree with Mother that the decision to restart Father's parenting time required additional evidence beyond the mere fact she had acted with "poor judgment" by "return[ing] to the relationship [and] expos[ing] the children to it again." [6] Appellant's Br. at 16, 18. The prohibition on Father's parenting time was not something Mother "could waive by conduct . . . ." *Id.* at 16. Rather, it was intended to protect the children, and Father was required to prove he no longer endangered them and that restarting his parenting time was in their best interests. Mother makes an analogy that illustrates why additional evidence was required to reinstate Father's parenting time:

> If a city condemns a building because the foundation is crumbling, one may presume the building is objectively unsafe. If a tenant later sneaks back in to sleep there because they have nowhere else to go, the building does not magically become safe. The tenant's poor judgment does not fix the foundation. Here, the trial court acted as if Mother's return to the relationship proved that Father's violent behavior and mental health were fixed. But the record makes clear the foundation was not fixed.

Appellant's Br. at 18.

---

[6] *See* Tamara L. Kuennen, *"Stuck" on Love*, 91 DENV. U. L. REV. 171, 174 (2013) (explaining scholars have found many rational reasons why women in abusive relationships may stay or reunite with their abusive partner, including "safety (the well-documented fact that separation is the most dangerous time for victims), finances, cultural norms, religion, and immigration status, to name but a few"). Clearly, many of these reasons are not necessarily reflective of the best interests of the couple's children.

[20] To be sure, Father did not prove the foundation was fixed. He presented scant evidence he had remedied the court's original concerns about his abusive tendencies and mental health issues. While Father claimed he had taken various classes while in prison, including those related to anger management and domestic violence, he didn't expand on that claim or produce any documentation supporting it. *See* Tr. at 10. Likewise, the trial court didn't rely on this claim in reinstating his parenting time. Furthermore, Father admitted he was currently serving a sentence for invasion of privacy and his relationship with Mother had ended after he punched a porch light while arguing with her and was charged with intimidation. It's also telling that neither Father nor the trial court invoked the phrase "best interests" at the October 2025 hearing, and the court's order likewise did not find that reinstating Father's parenting time was in the children's best interests. Under these circumstances, the court abused its discretion by restarting Father's parenting time without adequate evidence and proper consideration of whether doing so was in the children's best interests.[7]

---

[7] Because we reverse the trial court's parenting time order for other reasons, we do not address Mother's argument that the court abused its discretion by ordering "Father to violate his house arrest to facilitate custody exchanges." Appellant's Br. at 20. However, we briefly comment on Mother's concern with the parenting time schedule imposed by the court. Given the length of time since he'd seen his children, Father asked for two months of supervised parenting time, yet the court ordered only one before transitioning to parenting time pursuant to the IPTG. The court's decision to accelerate Father's role in the children's lives more rapidly than even Father requested could be perceived as another way in which the court's focus was taken off the children's best interests. *See T.R. v. E.R.*, 134 N.E.3d 409, 415 (Ind. Ct. App. 2019) (affirming order requiring agency-supervised visitation given the father's erratic behavior, noncompliance with services, and because he hadn't exercised parenting time in eighteen months). Indeed, the record in the underlying case shows Mother filed an emergency motion to suspend Father's parenting time on December 4, 2025, just weeks after it began. The motion alleged Father failed to appropriately communicate and interact with the

## Conclusion

For the foregoing reasons, we reverse the judgment of the trial court granting Father's request to restart parenting time and remand for further proceedings consistent with this opinion.

Reversed and remanded.

Brown, J., and Altice, J., concur.

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Ciyou & Associates, P.C.
Indianapolis, Indiana

Anne Medlin Lowe
Fugate Gangstad Lowe LLC
Carmel, Indiana

---

children at multiple visits and the children's behavior and schooling suffered after the visits began. The court summarily denied Mother's motion, reasoning it had to be denied because the case was on appeal.